STATE OF HAWAII, Plaintiff-Appellee, *v.* KEITH D. BREZEE, Defendant-Appellant

NO. 8185

(CRIMINAL NO. 54102)

FEBRUARY 2, 1983

LUM, ACTING C.J., NAKAMURA AND PADGETT, JJ.,
CIRCUIT JUDGE CHANG, ASSIGNED BY REASON OF VACANCY,
AND CIRCUIT JUDGE SPENCER, IN PLACE OF
ASSOCIATE JUSTICE HAYASHI, DISQUALIFIED

OPINION OF THE COURT BY PADGETT, J.

This is an appeal from a conviction of murder and attempted rape. There are four claims of error. (1) That appellant's right to counsel was violated by the State in the statements taken from him. (2) That the language of the indictment for attempted rape was defective. (3) That the jury should have been instructed on the attempted rape count that "conduct shall not be considered a substantial step under [the attempt statute] unless it is strongly corroborative of the defendant's criminal intent". (4) That there was insufficient evidence to support the convictions. We affirm.

With respect to points (2) and (4) above, we find them to be

so plainly devoid of merit that no further discussion is necessary.

As to the claimed violation of the right to counsel, certain evidence is undisputed. After appellant had been arrested on another charge and was being held thereunder, Detective Lum, on the morning of June 24, 1980, approached appellant and asked him if he desired to make a statement. Appellant stated that he wished to talk to his attorney. Detective Lum thereupon requested the turnkey to attempt to contact appellant's attorney, Michael Weight. Approximately two hours later, the turnkey reported to Detective Lum that he had been unable to reach the attorney and that the appellant wanted to see him. Detective Lum then returned to the appellant's cell and the appellant informed him that he wished to make a statement. Lum then took him to an office and began the procedure of explaining to him his rights and outlining what would be done in the course of taking the statement, i.e., that it would be taped, that appellant could have it videotaped if he wished, etc. During the course of this conversation and before any questions about the crime were asked of appellant, the attorney returned a call made to his office by Detective Lum. Lum explained to him the situation and the attorney and appellant conversed.

In that conversation, the attorney advised the appellant not to give a statement but the appellant stated that he wished to give such a statement anyway. The attorney then spoke, over the phone, to Detective Lum and informed him that he had advised the appellant not to give a statement but the appellant intended to go ahead. He asked Detective Lum to wait until that afternoon when he could be present but Detective Lum refused. At this point, the detective called the prosecutor's office and was told to prepare an additional form for appellant's signature, noting that he had had the opportunity to converse with his attorney; that he had been advised not to make a statement; and that he made the statement of his own free will and against the advice of his attorney.

The detective then explained the warning form (HPD 81) in detail to the appellant who answered orally the various questions therein contained indicating that he knew he was in custody; that he did not want an attorney; that he understood

that he could stop answering questions at any time; and that he would like to tell the detective what had happened. He initialed each of the questions and signed the form. The detective also presented him with another form, which is Exhibit 31 in evidence, which stated

> I have had the oppurtunity [sic] to converse with my lawyer Michael WEIGHT by telephone this morning at about 1130 hours, 6-24-80. My lawyer advised me not to make a statement concerning the death and my involvement of Sandra DAMAS.

> I make the following statement on my own free will against the advise [sic] of my attorney.

Appellant read this form and signed it, dating it and giving the time. The detective also signed it.

The Supreme Court of the United States in *Edwards* v. *Arizona,* 451 U.S. 477, 485-86, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378, 386 (1981), stated:

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [Footnote omitted.] We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police.

In this case, the record is clear that the police scrupulously honored the principles just quoted and that it was appellant who initiated further communications with the police by asking that Detective Lum come back to his cell and by informing him that he wished to make a statement. Even then, before interrogating the appellant as to the crime, Detective Lum made further and successful efforts to contact appellant's attorney. The attorney, when contacted, spoke to the appellant and advised him not to make a statement. The appellant nevertheless elected to make such a statement. Thereupon, the standard waiver of rights form was read and explained to him,

he answered the questions orally and initialed them on the form and signed them. He then was given an additional statement indicating that he had talked to his attorney; that his attorney had advised him not to make a statement; and that he was going ahead of his own free will and he signed that statement. Only then did the interrogation with respect to the crime commence.

It is true that the attorney (not the appellant) after advising appellant not to make a statement and being rebuffed, asked for a delay in the taking of the statement until he could be present some hours later. This, understandably, was refused.

This case is completely unlike the facts in *Brewer* v. *Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). In that case, the appellant was arraigned in Davenport, Iowa. Both his lawyer at the arraignment and his lawyer in Des Moines, Iowa, had advised him not to make any statements until he had consulted with the lawyer in Des Moines after having been returned there, and the police officers, who were to accompany him on the automobile trip back to Des Moines, agreed not to question him during the trip. However, one of the police officers, knowing that the defendant was a former mental patient and was deeply religious, sought to obtain and did obtain incriminating remarks and information from him by stating to him during the drive that he felt they should stop and locate the girl's body because her parents were entitled to a Christian burial for the girl who was taken away from them on Christmas Eve. As a result of that, the defendant made incriminating statements during the trip and finally directed the police to the girl's body. Thus, that case dealt with the initiation of further contact by the police rather than the defendant, and clearly violated the right to counsel. Our case is entirely different. After requesting an attorney, appellant not only initiated the further contact regarding a statement but was actually advised by his attorney not to make such a statement and nevertheless proceeded. His contention that his right to counsel was violated is meritless.

Appellant's third point is that an instruction on the attempted rape charge should have been given to the effect that appellant's conduct should not be considered a substantial step in the attempted rape unless it was strongly corroborative of

appellant's criminal intent. Under *State* v. *Brighter,* 63 Haw. 105, 621 P.2d 381 (1980), such an instruction, if timely requested, should have been given. It was not, however, requested.

Where an instruction is not requested, we nevertheless have the power to consider the question of whether such an instruction should have been given where the failure to give it constitutes "plain error." *State* v. *Carson,* 1 Haw. App. 214, 617 P.2d 573 (1980); Rule 52(b), HRPP. This court has never defined "plain error" but has indicated that "plain error", on appeal, may be found where there were errors in jury instructions if it is shown that substantial rights of the defendant may have been affected. *State* v. *Onishi,* 59 Haw. 384, 385, 581 P.2d 763, 765 (1978); *State* v. *Iaukea,* 56 Haw. 343, 355, 537 P.2d 724, 733 (1975).

As is noted in 3A Wright, FEDERAL PRACTICE AND PROCEDURE, § 856, p. 337 (1982), under the federal practice there are no hard and fast classifications in either the application of the principle or the use of the term "plain error".

In *U.S.* v. *Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557 (1936), the court said:

> In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.

There was ample testimony from other witnesses as to the character of the victim, her relationship with the appellant and her statements about the prospective, and, as it proved, fatal meeting with him, from which the jury could have disbelieved appellant's statements as to previous sexual relations with the victim.

Here, the victim, when found, had her shirt removed and stuffed in her mouth; her brassiere was pulled up over her breasts; her jeans were pulled down to her knees; she had large abrasions on her back; and there was a bruise of the fossa navicularis, a part of the vagina, which could have been caused by a blunt force applied to the area and could have been caused an hour to two days before the victim's death. Certainly, the

physical evidence could have been viewed as strongly corroborating the inference that appellant's attack on the victim was a sexual assault.

Appellant's statements as to the events which transpired between himself and the victim on the night she was murdered are confused and contradictory in many respects. He acknowledges that the victim's shirt was off and that he stuffed it in her mouth. His statements as to what had happened are clearly inconsistent with any explanation other than sexual assault for the removal of her shirt, for stuffing it in her mouth, with the severe abrasions on her back, and with the bruise in the vaginal area.

The physical evidence thus pointed to attempted rape and the jury could, and obviously did, find his denial of attempted sexual intercourse incredible. The claimed error in not giving the unrequested instruction, *sua sponte* certainly does not seriously affect the fairness, integrity or public reputation of judicial proceedings. It is clearly not an obvious one, as is shown by the fact that it was missed by experienced defense counsel, the prosecutor and the court. The evidence amply sustains the conviction on the attempted rape charge and we, accordingly, see no "plain error" in the failure, unasked, to give the instruction in question. We think, given the physical evidence and the conviction of murder, the jury would have convicted appellant of attempted rape even if the instruction had been given. Affirmed.

*Stephen T. Hioki* for appellant.

*Shirley Smith,* Deputy Prosecuting Attorney, for appellee.

### DISSENTING OPINION OF NAKAMURA, J.

"In *Massiah v. United States,* [377 U.S. 201 (1964),] ... [the Supreme] Court held that the Government violated the Sixth Amendment when it deliberately elicited incriminating information from an indicted defendant who was entitled to assistance of counsel." *United States v. Henry,* 447 U.S. 264, 275 (1980) (Powell, J., concurring). "The rule of *Massiah* serves the salutary purpose of preventing police interference with the relationship between a suspect and his counsel once formal proceedings have been initiated." *Id.* at 276.

The court concludes no constitutional violation occurred here when the police, with the advice and aid of the prosecutor, secured incriminating information from an indicted defendant over the objection of his court-appointed counsel, resting its conclusion on *Edwards v. Arizona,* 451 U.S. 477 (1981). But *Edwards* dealt with Fifth Amendment[1] rights, not the Sixth Amendment[2] right to counsel, and I find it inapposite. As Detective Lum deliberately elicited inculpatory information from Keith Brezee in the absence of counsel and the Sixth Amendment brooks no such interference with a defendant's right to the assistance of counsel after formal charges have been brought against him, I respectfully dissent.

I.

On June 22, 1980, Keith Brezee was arrested on suspicion of having committed an offense unrelated to this case. At 8:55 a.m. on June 24, 1980, Detective Lum proceeded to the cellblock at the Honolulu Police Department where the defendant was being held to seek a statement from him regarding the offenses involved here, for which he had been indicted in March of 1980. Although the defendant had indicated in March that he would not make a statement, Detective Lum

---

[1] The Fifth Amendment to the United States Constitution reads:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any Criminal Case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law, nor shall private property be taken for public use, without just compensation.

[2] The Sixth Amendment reads:

*In all criminal prosecutions, the accused shall enjoy the right* to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and *to have the Assistance of Counsel for his defence.* (Emphasis added).

nevertheless "wanted to get a statement from him, [to] get it over with." The officer was further aware counsel had been appointed to assist the defendant, but did not inform the attorney of the decision to approach the defendant again.

After engaging in "mostly small talk" with Keith Brezee, the officer urged the defendant to "give a statement to get it over with." The defendant expressed a desire to speak to his attorney instead, and the turnkey in the cellblock was instructed to place a call to counsel. The turnkey made several attempts over the next two hours to reach the attorney but did not succeed. At about 10:55 a.m., the turnkey informed Detective Lum that Keith Brezee wanted to speak to him. When the officer returned to the cellblock the defendant, he claims, immediately stated, "I want to make a statement." However, the defendant states "I asked him [Detective Lum] to make a call to you [the attorney] because we [the turnkey and himself] couldn't get in contact with you." He claims the detective again inquired whether he would make a statement, to which he responded affirmatively. Thereupon, the defendant was taken to Detective Lum's office in the Police Department's Homicide Division. But no attempt to reach defense counsel was made at this time.

According to the police officer, the defendant was "briefed" from 11:00 to 11:15 a.m. on "what was going to transpire as far as the taking of the statement" was concerned. After "debating whether to call" counsel or not, the officer decided to call the attorney's office at 11:15 a.m. but was informed he would not be available for at least a half hour. The officer therefore continued with the "briefing," as "Keith Brezee was still inclined to give a statement." At 11:30 a.m. the officer called the attorney's office and spoke to him, informing counsel that "Keith Brezee is here" and "wants to make a statement." The attorney asked to speak to the defendant on the telephone and was permitted to do so. Detective Lum remained in the office and listened to Keith Brezee's end of the conversation. Counsel then told Detective Lum that the defendant had been advised not to make a statement without a face-to-face conference with counsel. He further informed the officer that he would be at the police station at 2:00 p.m. and no statement should be elicited from the defendant until then. Detective Lum's response was:

[L]ook, I have my job to do. Keith Brezee still wants to make a statement. I have to do my job.

The officer then had the defendant execute two written "waivers." The first document was a standard form, HPD Form 81, devised and employed by the Honolulu Police Department to apprise defendants of their "Miranda" rights under the Fifth Amendment and to denote waivers of such rights. The second was a special document[3] drafted by the officer at the suggestion and with the guidance of a deputy prosecuting attorney after he had been advised of the circumstances under which information was being elicited from the defendant. Detective Lum proceeded to question Keith Brezee thereafter without the presence of counsel.

The defendant's account of the fateful confrontation in the detective's office does not parallel that given by the latter. The State would have us believe the thirty-minute "briefing" prior to the officer's telephone conversation with counsel merely involved a recapitulation of the procedure to be followed in the interrogation to follow; the defendant, then a twenty-year-old high school dropout, testified there was more.[4]

---

[3] This document read as follows:

I have had the oppurtunity [sic] to converse with my lawyer Michael WEIGHT by telephone this morning at about 1130 hours, 6-24-80. My lawyer advised me not to make a statement concerning the death and my involvement of Sandra DAMAS.

I make the following statement on [sic] my own free will against the advise [sic] of my attorney.

[4] The partial transcript of the relevant testimony, for example, reflects the following:

Q What did you tell him when he asked you if you wanted a lawyer?
A I told him I wanted a lawyer right here but —
Q What did he say?
A He advised me that, that are you still going to lean on Michael Weight, or are you going to, you know, be like a man or something.

. . . .

Q (By Mr. Weight) What did you say, Keith, after he said that to you?
A I told him I wanted my lawyer. Then he said, are you going to lean on Michael Weight. Are you going to be a baby to lean on Michael Weight?
Q He said, are you going to be a baby? How did that make you feel?
A Kind of sore inside, you know, hurt inside.
Q All right. What did you say to him when he said that to you?
A I hesitated for couple of minutes. Then I just confessed.

II.

A.

The Supreme Court "first applied the Sixth Amendment to postindictment communications between the accused and agents of the Government in *Massiah v. United States, supra.*" *United States v. Henry,* 447 U.S. at 270. And its holding was "that the petitioner was denied the basic protections of . . . [the Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States,* 377 U.S. at 206. The ruling was premised "squarely on interference with . . . [the defendant's] right to counsel." *United States v. Henry,* 447 U.S. at 270.

Here, the court relies on *Edwards v. Arizona, supra,* in concluding there was no violation of Keith Brezee's constitutional rights despite the use at trial of his own inculpatory statement, purposefully obtained by the State after his indictment and in the absence of his court-appointed counsel. But as noted earlier, the Supreme Court's decision in *Edwards* involved the invocation of the right to remain silent and the general right to seek the advice of counsel that are guaranteed by the Fifth Amendment to any person suspected of criminal activity and being interrogated by the police in connection therewith. The specific Sixth Amendment right to the effective assistance of counsel that unquestionably accrues when a person has been formally charged with a crime was not considered there.[5] It is the latter that concerns us, and the record bears out

---

[5] The Court's opinion renders this clear, as note 7 therein reads in relevant part:

We thus need not decide Edwards' claim that the State deprived him of his right to counsel under the Sixth and Fourteenth Amendments as construed and applied in *Massiah v. United States,* 377 U.S. 201 (1964). In that case, the Court held that the Sixth Amendment right to counsel arises whenever an accused has been indicted or adversary criminal proceedings have otherwise begun and that this right is violated when admissions are subsequently elicited from the accused in the absence of counsel.

. . . .

The Arizona Supreme Court did not address the Sixth Amendment question, nor do we.

Edwards v. Arizona, 451 U.S. at 480-82 n.7.

the claim of infringement with respect to this constitutional guarantee.

B.

Detective Lum approached the cellblock at the Honolulu Police Department on June 24, 1980 with a single-minded purpose to obtain self-incriminating evidence from Keith Brezee for use against him at trial. The approach itself constituted police interference with the relationship between the accused and counsel, one established by court decree after the commencement of prosecution, since it was without counsel's knowledge and approval.[6] Though the defendant rebuffed the police officer's initial insinuations that he should "get it over with" by stating he wanted to consult his lawyer, the defendant later succumbed and indicated a willingness to make a statement. Rather than notifying counsel of the defendant's decision, the detective began to "condition" the defendant for questioning.

When counsel was informed of the turn of events a half hour later, he asked to speak to the defendant on the telephone. The conversation that followed could hardly be deemed consultation between defendant and counsel, for the defendant was at the police station in the intimidating presence of the officer who had been pressing him to disregard the advice of counsel and the officer could hear every word defendant

---

[6] DR 7-104 of the Code of Professional Responsibility adopted by this court provides in part:
(A) During the course of his representation of a client a lawyer shall not:
(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.
Although the code does not apply to nonlawyers, the conduct of the police officer nevertheless violated the purpose and policy of the disciplinary rule. Furthermore, a deputy prosecuting attorney was later implicated in the matter, and he aided and abetted the officer's successful attempt to obtain self-incriminating evidence from the defendant over the objections of appointed counsel. This was clearly a violation of the spirit, if not the letter, of the disciplinary rule.

uttered. Counsel's further request that no statement be taken until he could confer with the defendant was disdainfully brushed aside.

But "it is the absolute right of parties charged with crime to confer privately with their· attorneys." *Barber v. Municipal Court,* 24 Cal. 3d 742, 751, 598 P.2d 818, 823, 157 Cal. Rptr. 658, 663 (1979). And,

> [t]he fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself. Even guilty individuals are entitled to be advised of strategies for their defense.

*United States v. Levy,* 577 F.2d 200, 209 (3d Cir. 1978). *Cf. House v. Mayo,* 324 U.S. 42, 46 (1945) (There is a denial of fair trial where the defendant is "not afforded a reasonable opportunity to consult" with his attorney). There definitely was an interference with a right guaranteed by the Sixth Amendment here. *United States v. Henry, supra; Brewer v. Williams,* 430 U.S. 387 (1977); *Massiah v. United States, supra.*

## III.

Implicit in the court's opinion is an assumption that no constitutional violation occurred because interrogation of the defendant did not commence until he signed the two waivers. But Sixth Amendment protections, as we have seen, apply in situations where the interrogation is indirect and surreptitious, as well as direct, and where there is no interrogation. And the Supreme Court instructs us that "interrogation" as defined by "Miranda" and applied to Fifth Amendment rights is not necessarily pertinent in a discussion of Sixth Amendment

rights.[7] Thus, waiver of counsel in the Fifth Amendment sense is not a dispositive factor.

Even if waiver were dispositive, the defendant's right to counsel was not subject to easy waiver; for

> [a] person charged with a felony in a state court has an unconditional and absolute constitutional right to a lawyer. *Gideon v. Wainwright,* 372 U.S. 335. This right attaches at the pleading stage of the criminal process, *Rice v. Olson,* 324 U.S. 786, and may be waived only by voluntary and knowing action, *Johnson v. Zerbst,* 304 U.S. 458; *Carnley v. Cochran,* 369 U.S. 506. Waiver will not be "lightly presumed," and a trial judge must "indulge every reasonable presumption against waiver." *Johnson, supra,* at 464.

*Boyd v. Dutton,* 405 U.S. 1, 2-3 (1972). The record, in my opinion, does not reflect a proper waiver of a Sixth Amendment right under the stringent standards first enunciated in *Johnson v. Zerbst* and often reiterated thereafter. Waiver of such a right requires "both the capacity to make an understanding choice and an absence of subverting factors so that

---

[7] The clearest statement in this regard is probably the footnote in Rhode Island v. Innis, 446 U.S. 291 (1980), which reads:

> There is language in the opinion of the Rhode Island Supreme Court in this case suggesting that the definition of "interrogation" under *Miranda* is informed by this Court's decision in *Brewer v. Williams,* 430 U. S. 387. 120 R. I. ___, ___, 391 A. 2d 1158, 1161-1162. This suggestion is erroneous. Our decision in *Brewer* rested solely on the Sixth and Fourteenth Amendment right to counsel. 430 U.S., at 397-399. That right, as we held in *Massiah v. United States,* 377 U. S. 201, 206, prohibits law enforcement officers from "deliberately elicit[ing]" incriminating information from a defendant in the absence of counsel after a formal charge against the defendant has been filed. Custody in such a case is not controlling; indeed, the petitioner in *Massiah* was not in custody. By contrast, the right to counsel at issue in the present case is based not on the Sixth and Fourteenth Amendments, but rather on the Fifth and Fourteenth Amendments as interpreted in the *Miranda* opinion. *The definitions of "interrogation" under the Fifth and Sixth Amendments, if indeed the term "interrogation" is even apt in the Sixth Amendment context, are not necessarily interchangeable, since the policies underlying the two constitutional protections are quite distinct.* See Kamisar, *Brewer v. Williams, Massiah, and Miranda:* What is "Interrogation"? When Does it Matter?, 67 Geo. L.J. 1, 41-55 (1978).

446 U.S. at 300 n.4 (emphasis added).

the choice is clearly free and responsible." *Von Moltke v. Gillies,* 332 U.S. 708, 729 (1948) (separate opinion of Frankfurter, J.).

I would reverse the judgment of conviction and remand the case for a new trial.