## OREGON *v.* BRADSHAW

No. 81–1857.   Argued March 28, 1983—Decided June 23, 1983

REHNQUIST, J., announced the judgment of the Court and delivered an opinion, in which BURGER, C. J., and WHITE and O'CONNOR, JJ., joined. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 1047. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 1051.

*Dave Frohnmayer*, Attorney General of Oregon, argued the cause for petitioner. With him on the briefs were *William F. Gary*, Solicitor General, *James E. Mountain, Jr.*, Deputy Solicitor General, and *Robert E. Barton, Thomas H. Denney*, and *Stephen G. Peifer*, Assistant Attorneys General.

*Gary D. Babcock* argued the cause for respondent. With him on the brief was *John Daugirda*.

JUSTICE REHNQUIST announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR joined.

After a bench trial in an Oregon trial court, respondent James Edward Bradshaw was convicted of the offenses of

first-degree manslaughter, driving while under the influence of intoxicants, and driving while his license was revoked. The Oregon Court of Appeals reversed his conviction, holding that an inquiry he made of a police officer at the time he was in custody did not "initiate" a conversation with the officer, and that therefore statements by the respondent growing out of that conversation should have been excluded from evidence under *Edwards* v. *Arizona*, 451 U. S. 477 (1981). We granted certiorari to review this determination. 459 U. S. 966 (1982).

In September 1980, Oregon police were investigating the death of one Lowell Reynolds in Tillamook County. Reynolds' body had been found in his wrecked pickup truck, in which he appeared to have been a passenger at the time the vehicle left the roadway, struck a tree and an embankment, and finally came to rest on its side in a shallow creek. Reynolds had died from traumatic injury, coupled with asphyxia by drowning. During the investigation of Reynolds' death, respondent was asked to accompany a police officer to the Rockaway Police Station for questioning.

Once at the station, respondent was advised of his rights as required by *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Respondent then repeated to the police his earlier account of the events of the evening of Reynolds' death, admitting that he had provided Reynolds and others with liquor for a party at Reynolds' house, but denying involvement in the traffic accident that apparently killed Reynolds. Respondent suggested that Reynolds might have met with foul play at the hands of the assailant whom respondent alleged had struck him at the party.

At this point, respondent was placed under arrest for furnishing liquor to Reynolds, a minor, and again advised of his *Miranda* rights. A police officer then told respondent the officer's theory of how the traffic accident that killed Reynolds occurred; a theory which placed respondent behind the wheel of the vehicle. Respondent again denied his involvement, and said "I do want an attorney before it goes very

much further." App. 72. The officer immediately terminated the conversation.

Sometime later respondent was transferred from the Rockaway Police Station to the Tillamook County Jail, a distance of some 10 or 15 miles. Either just before, or during, his trip from Rockaway to Tillamook, respondent inquired of a police officer, "Well, what is going to happen to me now?" The officer answered by saying: "You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you have requested an attorney, you know, it has to be at your own free will." *Id.*, at 16. See 54 Ore. App. 949, 951, 636 P. 2d 1011, 1011–1012 (1981). Respondent said he understood. There followed a discussion between respondent and the officer concerning where respondent was being taken and the offense with which he would be charged. The officer suggested that respondent might help himself by taking a polygraph examination. Respondent agreed to take such an examination, saying that he was willing to do whatever he could to clear up the matter.

The next day, following another reading to respondent of his *Miranda* rights, and respondent's signing a written waiver of those rights, the polygraph was administered. At its conclusion, the examiner told respondent that he did not believe respondent was telling the truth. Respondent then recanted his earlier story, admitting that he had been at the wheel of the vehicle in which Reynolds was killed, that he had consumed a considerable amount of alcohol, and that he had passed out at the wheel before the vehicle left the roadway and came to rest in the creek.

Respondent was charged with first-degree manslaughter, driving while under the influence of intoxicants, and driving while his license was revoked. His motion to suppress the statements described above was denied, and he was found guilty after a bench trial. The Oregon Court of Appeals, relying on our decision in *Edwards* v. *Arizona, supra,* re-

versed, concluding that the statements had been obtained in violation of respondent's Fifth Amendment rights. 54 Ore. App. 949, 636 P. 2d 1011 (1981). We now conclude that the Oregon Court of Appeals misapplied our decision in *Edwards*.

In *Edwards* the defendant had voluntarily submitted to questioning but later stated that he wished an attorney before the discussions continued. The following day detectives accosted the defendant in the county jail, and when he refused to speak with them he was told that "he had" to talk. We held that subsequent incriminating statements made without his attorney present violated the rights secured to the defendant by the Fifth and Fourteenth Amendments to the United States Constitution. In our opinion, we stated:

> "[A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, see *North Carolina* v. *Butler*, [441 U. S. 369, 372–376 (1979)], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that *an accused, such as [the defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*" 451 U. S., at 484–485 (footnote omitted) (emphasis added).

Respondent's question in the present case, "Well, what is going to happen to me now?", admittedly was asked prior to

respondent's being "subject[ed] to further interrogation by the authorities." *Id.*, at 484. The Oregon Court of Appeals stated that it did not "construe defendant's question about what was going to happen to him to have been a waiver of his right to counsel, invoked only minutes before . . . ." 54 Ore. App., at 953, 636 P. 2d, at 1013. The Court of Appeals, after quoting relevant language from *Edwards,* concluded that "under the reasoning enunciated in *Edwards,* defendant did not make a valid waiver of his Fifth Amendment rights, and his statements were inadmissible." *Ibid.*

We think the Oregon Court of Appeals misapprehended the test laid down in *Edwards.* We did not there hold that the "initiation" of a conversation by a defendant such as respondent would amount to a waiver of a previously invoked right to counsel; we held that after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U. S., at 485. This was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was. We recently restated the requirement in *Wyrick* v. *Fields,* 459 U. S. 42, 46 (1982) *(per curiam),* to be that before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the "suspect himself initiates dialogue with the authorities."

But even if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. This is made clear in the following footnote to our *Edwards* opinion:

> "If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not

wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, *whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances,* including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." 451 U. S., at 486, n. 9 (emphasis added).

This rule was reaffirmed earlier this Term in *Wyrick* v. *Fields, supra.*

Thus, the Oregon Court of Appeals was wrong in thinking that an "initiation" of a conversation or discussion by an accused not only satisfied the *Edwards* rule, but *ex proprio vigore* sufficed to show a waiver of the previously asserted right to counsel. The inquiries are separate, and clarity of application is not gained by melding them together.

There can be no doubt in this case that in asking, "Well, what is going to happen to me now?", respondent "initiated" further conversation in the ordinary dictionary sense of that word. While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in *Edwards*.

Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness

and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation. That the police officer so understood it is apparent from the fact that he immediately reminded the accused that "[y]ou do not have to talk to me," and only after the accused told him that he "understood" did they have a generalized conversation. 54 Ore. App., at 951, 636 P. 2d, at 1011–1012. On these facts we believe that there was not a violation of the *Edwards* rule.

Since there was no violation of the *Edwards* rule in this case, the next inquiry was "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards* v. *Arizona*, 451 U. S., at 486, n. 9. As we have said many times before, this determination depends upon "'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" *North Carolina* v. *Butler*, 441 U. S. 369, 374–375 (1979) (quoting *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938)). See also *Edwards* v. *Arizona, supra,* at 482–483.

The state trial court made this inquiry and, in the words of the Oregon Court of Appeals, "found that the police made no threats, promises or inducements to talk, that defendant was properly advised of his rights and understood them and that within a short time after requesting an attorney he changed his mind without any impropriety on the part of the police. The court held that the statements made to the polygraph examiner were voluntary and the result of a knowing waiver of his right to remain silent." 54 Ore. App., at 952, 636 P. 2d, at 1012.

We have no reason to dispute these conclusions, based as they are upon the trial court's firsthand observation of the

witnesses to the events involved. The judgment of the Oregon Court of Appeals is therefore reversed, and the cause is remanded for further proceedings.

*It is so ordered.*

JUSTICE POWELL, concurring in the judgment.

The Court's recent decision in *Edwards* v. *Arizona,* 451 U. S. 477 (1981), has resulted in disagreement as to whether it announced a new *per se* rule.[1] My hope had been that this case would afford an opportunity to clarify the confusion. As evidenced by the differing readings of *Edwards* by JUSTICES MARSHALL and REHNQUIST in their respective opinions, my hope has not been fully realized. JUSTICE MARSHALL, and the three Justices who join his opinion, would affirm the Oregon Court of Appeals because it "properly applied *Edwards." Post,* at 1053. JUSTICE REHNQUIST, and the three Justices who join him, would "conclude that the Oregon Court of Appeals misapplied our decision in *Edwards." Ante,* at 1043. In view of the disagreement here, it is not sur-

---

[1] Compare *Fields* v. *Wyrick,* 682 F. 2d 154, 158 (CA8) (*Edwards* "creat[ed] a per se rule"), rev'd and remanded, 459 U. S. 42 (1982) *(per curiam); United States* v. *Thierman,* 678 F. 2d 1331, 1338 (CA9 1982) (Wallace, J., dissenting) (reading *Edwards* as applying *per se* rule); *State* v. *Willie,* 410 So. 2d 1019, 1028 (La. 1982) (recognizing *per se* rule in *Edwards); State* v. *McCloskey,* 90 N. J. 18, 25, 446 A. 2d 1201, 1205 (1982) *("Edwards* established a *per se* rule"); *Giacomazzi* v. *State,* 633 P. 2d 218, 226 (Alaska 1981) (Rabinowitz, C. J., dissenting) (*Edwards* "Court fashioned a per se rule"), with *Richardson* v. *State,* 274 Ark. 473, 477–478, 625 S. W. 2d 504, 506–507 (1981) (applying "totality of the circumstances" test rather than *per se* rule); *State* v. *Acquin,* 187 Conn. 647, 671, 448 A. 2d 163, 175 (1982) ("we do *not* read *Edwards* to prescribe a per se rule"); *Leuschner* v. *State,* 49 Md. App. 490, 497, 433 A. 2d 1195, 1199 (1981) (*Edwards* does not create *per se* rule); *State* v. *Scott,* 626 S. W. 2d 25, 29 (Tenn. Crim. App. 1981) (applying "totality of the circumstances" test rather than *per se* rule). See also *Wilson* v. *Zant,* 249 Ga. 373, 376, 290 S. E. 2d 442, 446 ("[a]ccepting that *[Edwards]* established a per se exclusionary rule," but expressing reservation), cert. denied, 459 U. S. 1092 (1982); *Leuschner, supra,* at 497, 433 A. 2d, at 1199 (recognizing uncertainty whether *Edwards* created *per se* rule).

prising that courts have differed as to whether *Edwards* announced a *per se* rule, and if so what rule. I joined the judgment in *Edwards* because on the facts "it [was] clear that Edwards [had been] taken from his cell against his will and [improperly] subjected to renewed interrogation." 451 U. S., at 490 (opinion concurring in result). I did not join the Court's opinion because I was "not sure what it mean[t]." *Id.*, at 488.

The opinions today reflect the ambiguity of some of the *Edwards* language, particularly on the meaning of "initiation." JUSTICE MARSHALL reads *Edwards* as requiring not only that the accused initiate further communication, but also that the communication be *"about the subject matter of the criminal investigation."* *Post*, at 1053 (emphasis in original). JUSTICE REHNQUIST, however, would require only that the suspect "evinc[e] a willingness and a desire for a generalized discussion about the investigation." *Ante*, at 1045–1046. This formulation would include an "initiation" of conversation "in the ordinary dictionary sense" of the word, *ante*, at 1045, excluding "inquiries . . . that are so routine that they cannot be fairly said to represent a desire . . . to open up a more generalized discussion relating directly or indirectly to the investigation," *ibid.*

Both Justices agree in one respect. They view the "initiation" question as the first step of a two-step analysis, the second step being the application of the *Zerbst* standard that requires examination of the "totality of the circumstances." *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938). JUSTICE MARSHALL puts it this way:

> "If an accused has himself initiated further communication with the police, it is still necessary to establish as a separate matter the existence of a knowing and intelligent waiver under *Johnson* v. *Zerbst* . . . ." *Post*, at 1055, n. 2.

JUSTICE REHNQUIST's opinion observes that the initiation and the voluntariness of the waiver under *Zerbst* "are sepa-

rate, and clarity of application is not gained by melding them together." *Ante*, at 1045.

This bifurcating of the *Zerbst* standard is not compelled by *Edwards* or any of our other cases. The inquiry in *Edwards* did focus on the reopening of communication with the accused by the police—a reopening that properly was held to be coercive. As there were no other significant facts or circumstances bearing upon the waiver question, there was no occasion for the Court to consider whether a two-step analysis is required in the more customary case.[2] An incarcerated person, accused of crime, does not remain silent and speak only when conversation is initiated by others, whether by fellow prisoners, guards, or law enforcement officers. Jail or prison confinements prior to indictment or trial may extend over days and weeks, and numerous conversations customarily occur, often accompanied by collateral facts and circumstances. Rarely can a court properly focus on a particular conversation, and intelligently base a judgment on the simplistic inquiry as to who spoke first.

In this case, for example, Bradshaw's initiating question ("what is going to happen to me now?") was not an isolated event. It was immediately followed by a renewal of *Miranda* warnings and additional conversation. The following day there was further conversation, a third reading of *Miranda* rights, and finally Bradshaw's signing of a written waiver of those rights. Only then did he confess. JUSTICE MARSHALL would hold that there can be no waiver of the right to counsel unless the accused himself opens a dialogue "about the subject matter of the criminal investigation." *Post*, at 1054; see also *post*, at 1053, 1055–1056. He states that "unless the accused himself initiates further communica-

---

[2] Perhaps what has caused some confusion is a failure to recognize that the only new element in *Edwards* was the emphasis on the prosecution's burden of proof in cases where—in the absence of relevant subsequent facts—the critical question of waiver focuses on whether the initial communication by the police was proper.

tion with the police, a valid waiver of the right to counsel cannot be established." *Post*, at 1055, n. 2. Under this view of the two-step analysis, a court never gets to the second step—however relevant subsequent facts and circumstances may be to a waiver—unless the accused was the first to speak and to say the right thing. This is illustrated by the reasoning in the dissenting opinion in this case. Since JUSTICE MARSHALL concludes that Bradshaw had not initiated the dialogue, he does not consider the subsequent facts and circumstances that were found by the trial court to satisfy the *Zerbst* standard. JUSTICE REHNQUIST, however, moves from the first to the second step to conclude that the facts and circumstances, when viewed in their entirety, clearly establish a valid waiver of the right to counsel. To this extent, I agree with his plurality opinion.

My concern is that a two-step analysis could confound the confusion evident from the differing views expressed by other courts, see n. 1, *supra*, and indeed evidenced by the conflicting reading of *Edwards* by JUSTICES MARSHALL and REHNQUIST.[3] The *Zerbst* standard is one that is widely understood and followed. It also comports with common sense. Fragmenting the standard into a novel two-step analysis—if followed literally—often would frustrate justice as well as

---

[3] We recently found it necessary to clarify uncertainty that had resulted from decisions of this Court that had undertaken, in Fourth Amendment cases, to draw lines that were too refined to be applied consistently. Last Term in *United States* v. *Ross*, 456 U. S. 798 (1982), the Court considered it necessary to "reject the precise holding" in *Robbins* v. *California*, 453 U. S. 420 (1981), and some of the language in *Arkansas* v. *Sanders*, 442 U. S. 753 (1979). 456 U. S., at 824. In my concurring opinion in *Ross*, I said it was "essential to have a Court opinion . . . that provides 'specific guidance to police and courts in this recurring situation.'" *Id.*, at 826 (quoting *Robbins*, *supra*, at 435 (POWELL, J., concurring in judgment)). The needed clarification and guidance were undertaken, successfully I think, in JUSTICE STEVENS' opinion for the Court. If the opinions today, when read together, do not provide reasonable clarification for law enforcement officers and courts, we have a duty—one that I think is compelling—to provide more specific guidance, much as we did in *Ross*.

common sense.[4]   Courts should engage in more substantive inquiries than "who said what first."   The holding of the Court in *Edwards* cannot in my view fairly be reduced to this.

We are unanimous in agreeing in this case, as in *Edwards*, that "the right to counsel [is] a prime example of those rights requiring the special protection of the knowing and intelligent waiver standard."   *Edwards*, 451 U. S., at 483.   We also agree that once the accused has requested counsel this right requires additional safeguards, particularly against any coercive form of custodial interrogation.   But the question of whether a suspect has waived this important right to counsel is uniquely one of fact, and usually must and should be left to the judgment of the trial court that has had the benefit of hearing the evidence and assessing the weight and credibility of testimony.   In the circumstances of this case, I agree that Bradshaw knowingly and intelligently waived his right to counsel, and that the judgment below therefore should be reversed.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

Because in my view the plurality has misapplied *Edwards* v. *Arizona*, 451 U. S. 477 (1981), I respectfully dissent.

I

In *Miranda* v. *Arizona*, 384 U. S. 436 (1966), this Court recognized that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice."   *Id.*, at 458.   Access to counsel was held essential to secure the Fifth Amendment privilege against self-incrimination.   "If the individual states

---

[4] I therefore prefer to read JUSTICE REHNQUIST's opinion merely as an analytical framework that—except in a case like *Edwards*—would not inhibit courts from a full examination of all relevant facts and circumstances.

that he wants an attorney, *the interrogation must cease until an attorney is present.*" *Id.*, at 474 (emphasis added). *Miranda* thus created a "rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare* v. *Michael C.*, 442 U. S. 707, 719 (1979).

The significance of the invocation of the right to counsel is premised in part on a lawyer's "unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation." *Ibid.* As JUSTICE WHITE has written:

> "[T]he reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." *Michigan* v. *Mosley*, 423 U. S. 96, 110, n. 2 (1975) (concurring in result).

Although an accused may waive his various *Miranda* rights and submit to interrogation, the Court has recognized that "additional safeguards are necessary when the accused asks for counsel." *Edwards* v. *Arizona*, 451 U. S., at 484. *Edwards* held that a valid waiver of the right to counsel cannot be established by showing only that the accused responded to further police-initiated custodial interrogation, even if he had again been advised of his rights. *Ibid.* An accused who invokes his right to counsel is not subject to further interrogation until counsel has been made available, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*, at 484–485.

To establish a waiver, it would thus be a *"necessary fact* that the accused, not the police, reopened the dialogue with the authorities." *Id.*, at 486, n. 9 (emphasis added).

In this case, respondent invoked his right to have counsel during custodial interrogation. Shortly thereafter, he asked a police officer, "Well, what is going to happen to me now?" The Oregon Court of Appeals concluded that respondent's question was not "a waiver of his right to counsel, invoked only minutes before, or anything other than a normal reaction to being taken from the police station and placed in a police car, obviously for transport to some destination." 54 Ore. App. 949, 953, 636 P. 2d 1011, 1013 (1981). Relying on *Edwards*, the Oregon court held that respondent had not initiated the subsequent interrogation.

The Oregon Court of Appeals properly applied *Edwards*.[1] When this Court in *Edwards* spoke of "initiat[ing] further communication" with the police and "reopen[ing] the dialogue with the authorities," it obviously had in mind communication or dialogue *about the subject matter of the criminal investigation.* The rule announced in *Edwards* was designed to ensure that any interrogation subsequent to an invocation of the right to counsel be at the instance of the accused, not the authorities. 451 U. S., at 485. Thus, a question or state-

---

[1] In rebuking the Oregon Court of Appeals for failing to distinguish between the initiation of a conversation and a valid waiver of the right to counsel, *ante,* at 1044, the plurality is attacking a straw man. Because it concluded that respondent had not initiated any conversation, the Oregon court never even undertook the distinct inquiry into the existence of a knowing and intelligent waiver. *Edwards* makes clear that, in the absence of "initiation" by an accused, there can be no valid waiver regardless of whatever else the accused may say or do. 451 U. S., at 484. Having concluded that respondent did not initiate further conversation, the Oregon court thus stated that there was no valid waiver in this case. This conclusion is entirely consistent with *Edwards.* Indeed, the Oregon court's decision contains lengthy quotations from *Edwards.* Unless we are to assume that the state court did not read the very portions of *Edwards* that it quotes, the plurality's attack is completely unjustified.

ment which does not invite further interrogation before an attorney is present cannot qualify as "initiation" under *Edwards*. To hold otherwise would drastically undermine the safeguards that *Miranda* and *Edwards* carefully erected around the right to counsel in the custodial setting.

The safeguards identified in *Edwards* hardly pose an insurmountable obstacle to an accused who truly wishes to waive his rights after invoking his right to counsel. A waiver can be established, however, only when the accused himself reopens the dialogue about the subject matter of the criminal investigation. Since our decision in *Edwards*, the lower courts have had no difficulty in identifying such situations. See, *e. g.*, *McCree* v. *Housewright*, 689 F. 2d 797 (CA8 1982) (defendant initiated reinterrogation by knocking on cell door and telling police officer that he wanted to make a statement); *United States* v. *Gordon*, 655 F. 2d 478 (CA2 1981) (defendant reopened dialogue by expressing a desire to provide information about someone else who should also be arrested); *State* v. *Brezee*, 66 Haw. 163, 657 P. 2d 1044 (1983) (defendant asked detective to come back to his cell and then expressed desire to make a statement); *Payne* v. *State*, 424 So. 2d 722 (Ala. Crim. App. 1982) (defendant asked for a meeting with police at which statements were made); *People* v. *Thomas*, 98 Ill. App. 3d 852, 424 N. E. 2d 985 (1981) (defendant initiated further communication by inquiring about accomplice's statements linking him to the crime), cert. denied, 456 U. S. 993 (1982); *State* v. *Pittman*, 210 Neb. 117, 313 N. W. 2d 252 (1981) (defendant initiated further conversation by stating that he was being "railroaded" by his codefendants).[2]

---

[2] In his opinion concurring in the judgment, JUSTICE POWELL suggests that there is confusion as to whether *Edwards* announced a *per se* rule. *Ante*, at 1047. In my view, *Edwards* unambiguously established such a rule. See 451 U. S., at 484–486, and n. 9. In any event, no confusion on this point can remain after today's decision for eight Justices manifestly agree

## II

I agree with the plurality that, in order to constitute "initiation" under *Edwards*, an accused's inquiry must demonstrate a desire to discuss the subject matter of the criminal investigation. Cf. *ante*, at 1045. I am baffled, however, at the plurality's application of that standard to the facts of this case. The plurality asserts that respondent's question, "[W]hat is going to happen to me now?", evinced both "a willingness and a desire for a generalized discussion about the investigation." *Ante*, at 1045–1046. If respondent's question had been posed by Jean-Paul Sartre before a class of philosophy students, it might well have evinced a desire for a "generalized" discussion. But under the circumstances of this case, it is plain that respondent's only "desire" was to find out where the police were going to take him. As the Oregon Court of Appeals stated, respondent's query came only minutes after his invocation of the right to counsel and was simply "a normal reaction to being taken from the police station and placed in a police car, obviously for transport to some destination." 54 Ore. App., at 953, 636 P. 2d, at 1013.[3] On these facts, I

that *Edwards* did create a *per se* rule. The plurality explicitly refers to the "prophylactic rule" of *Edwards*. *Ante*, at 1044. See also *ante*, at 1044–1045 (discussing the "*Edwards* rule"). The rule is simply stated: unless the accused himself initiates further communication with the police, a valid waiver of the right to counsel cannot be established. If an accused has himself initiated further communication with the police, it is still necessary to establish as a separate matter the existence of a knowing and intelligent waiver under *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938). The *only* dispute between the plurality and the dissent in this case concerns the meaning of "initiation" for purposes of *Edwards'* *per se* rule.

[3] The plurality seems to place some reliance on the police officer's reaction to respondent's question. The officer described his response as follows:

"I says, 'You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you have requested an attorney, you know, it has to be at your own free will.' I says, 'I can't prevent you from talking, but

fail to see how respondent's question can be considered "initiation" of a conversation about the subject matter of the criminal investigation.

To hold that respondent's question in this case opened a dialogue with the authorities flies in the face of the basic purpose of the *Miranda* safeguards. When someone in custody asks, "What is going to happen to me now?", he is surely responding to his custodial surroundings. The very essence of custody is the loss of control over one's freedom of movement. The authorities exercise virtually unfettered control over the accused. To allow the authorities to recommence an interrogation based on such a question is to permit them to capitalize on the custodial setting. Yet *Miranda*'s procedural protections were adopted precisely in order "to dispel the compulsion inherent in custodial surroundings." 384 U. S., at 458.

Accordingly, I dissent.

---

you understand where your place—you know, where your standing is here?' and he agreed. He says 'I understand.'"

As the officer's testimony indicates, respondent's statement was at best ambiguous. In any event, as the Oregon Court of Appeals noted, the officer clearly took advantage of respondent's inquiry to commence once again his questioning—a practice squarely at odds with *Edwards*. See 54 Ore. App., at 953, 636 P. 2d, at 1013.