STATE of Missouri, Plaintiff/Respondent,

v.

David NAUMOWICZ,
Defendant/Appellant.

David NAUMOWICZ, Movant/Respondent,

v.

STATE of Missouri,
Respondent/Respondent.

Nos. 64167, 67820.

Missouri Court of Appeals,
Eastern District,
Division Five.

May 21, 1996.

---

Lew A. Kollias, Emmett D. Queener, Asst. Public Defenders, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David R. Truman, Assistant Attorney General, Jefferson City, for respondent.

CHARLES B. BLACKMAR, Senior Judge.

The defendant was convicted of burglary in the first degree in violation of § 569.160 RSMo1994, the information charging that he entered an occupied dwelling house with the intent to commit the offense of indecent exposure in violation of § 566.130 RSMo1986, then in force but since repealed. He appeals the conviction and the denial of postconviction relief. We affirm.

## 1. *Sufficiency of the Evidence*

 K.W., then twelve years of age, awoke about 3 A.M. on March 11, 1992. She went into the hallway to get some medication for her aching ear and discovered the defendant trying to conceal himself against a wall outside her room. She screamed and ran downstairs to her parents' bedroom. The defendant fled and exited the house. K. recognized the defendant as a neighbor but, at her parents' suggestion, did not reveal this identification to the investigating officer.

A similar incident at another location was reported to police in September of 1992. The defendant was taken into custody and made a statement to a detective concerning the present charges, which was received in evidence after a motion to suppress was overruled. Pertinent portions of the statement were reported by the officer as follows:

> ... He stated that he had his eye on Mr. [W's] twelve year old daughter and he fantasized about fulfilling his sexual needs that he had. And that he wanted to enter Mr. [W's] house and fulfill these fantasies.

> . . . . .

The defendant stated that he entered the residence through an unlocked front door and roamed the halls looking into bedrooms where family members were sleeping. He wound up in K's bedroom. The officer then reported the defendant's further statement as follows:

> ... He wanted to pull the covers off of the girl, and he was hoping that she would be nude, ... without as little clothes as she could have on. That he wanted to masturbate as he looked down at her sleeping.

A person commits the crime of burglary in the first degree under § 569.160 RSMo1994 by knowingly entering a building or inhabitable structure while people are present "for the purpose of committing a crime therein." The crime of indecent exposure as defined by the statute then in force, since repealed, consisted of the knowing exposure of genitals "under circumstances in which he knows that his conduct is likely to cause affront or alarm." Sec. 566.130, RSMo1986.

The defendant argues that he effectively disclaimed any purpose of being observed while pursuing his perverted objective, and intended only to eroticize himself while K. was sleeping. The argument is insufficient. All that is required for the crime of indecent exposure is. the likelihood of observation. The defendant had every reason to believe that K. might waken if he made his way into her room and fulfilled his desires. *Cf. State v. Parker,* 738 S.W.2d 566 (Mo.App.1987). The charge, furthermore, is burglary. The material circumstance is intent to commit a crime. It makes no difference whether or not that intent is fulfilled. *State v. Harness,* 654 S.W.2d 297 (Mo.App.1983).

## 2. *The Miranda Problem*

The defendant argues that constitutional guidelines as prescribed by the Supreme Court of the United States were not followed when he was questioned by Detective Wayne Randall of the Festus police department, and that the court erred in receiving his statements in evidence. He preserved his claim in a pretrial motion to suppress and renewed his objection at trial. He elected not to testify at the suppression hearing, and so we have only Randall's testimony. The point requires careful analysis.

The defendant was arrested during the early morning hours of October 1, 1992, apparently on suspicion of recent "peeping tom" activity, and was taken to the Festus holdover. Randall was not the arresting officer. The report of the arrest, which had come to Randall's attention, stated that the defendant had been advised of his *Miranda* rights after being arrested and had said that he wanted to talk to a lawyer.

About 9:15 on the morning of October 1, 1992, three or four hours after the arrest, Randall spoke to the defendant in the holdover cell, asking him "if he'd like to speak to me." The defendant said that "he would, as to questions," and was taken to the interview room, an 8 by 12 room with an eight foot ceiling. Only the defendant and Randall were present. Randall was wearing a business suit and was unarmed.

The defendant began their conversation by complaining to Randall about his October arrest. Randall answered some of the defendant's questions. So far as the record shows Randall did not interrogate him about the details of the September incident. Randall then said that he would like to discuss the "burglary first" charges relating to the March incident, and undertook to advise the defendant of his *Miranda* rights. The defendant said that he was familiar with these rights because his father had been a police officer, and Randall did not advise him further at the time but rather told him that what he said would not be used against him. Defendant then made statements about the incident which is the subject of the present charges. Randall told him that what he said in the interview could not be used against him. The interview lasted about an hour and a half, during which the defendant described the March incident in detail. Randall gave the defendant the opportunity to use a telephone and asked him if he wanted to consult a lawyer. He declined both offers. Randall then suggested that he be returned to his cell to think matters over, and that Randall would then read him his rights and ask some more questions. The interview concluded about 11:15 A.M. Because no statement made during this interview was offered in evidence, we do not need to discuss the implications of the defendant's saying that he was so familiar with the *Miranda* warnings that he did not need further advice.

At about 2:11 P.M. the defendant was returned to the interview room. Randall asked him if he wanted to talk on the record and the defendant answered that he did. Randall then read him his *Miranda* rights and the defendant signed a waiver. After some questioning Randall turned on a tape recorder. The defendant made statements concerning his entering the W. home, including those quoted above.

■ The state starts off on the wrong foot by arguing in terms of the trial judge's "discretion" in admitting evidence. The question here is not one of discretion, but about whether the defendant's voluntary statements must be excluded from evidence under the prophylactic rule of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and its progeny.

■ The trial judge certainly could have found that the defendant understood his rights as to police interrogation, and voluntarily waived those rights after he was fully advised of them. The defendant argues, however, that when he said he wanted to consult counsel after being arrested for the September incident, Detective Randall acted improperly in approaching him the next morning. The case primarily relied on is *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), in which the Court states as follows: ". . . an accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) makes it clear that the *Edwards* rule applies even though the later interrogation relates to another offense and is conducted by an officer who did not know about the prior arrest, interrogation, and statement of a desire to consult counsel.

The question remains as to whether Randall's approach to the defendant in the holdover, four hours after his arrest, constituted an interrogation. We have only the officer's version of the incident. From his testimony the trial court could have found that he simply offered the defendant an opportunity to talk, and that the defendant seized on this opportunity to present complaints about his arrest, which did not relate to the present charges. The court could have found that there was no interrogation up to the point at which their conversation

about the September incident concluded. See *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in which an officer's remark about the dangers of a gun which might be found by a pupil in a school for retarded children, and the suspect, who had previously asserted his right to counsel, responded by offering to point out the location of the gun. The Court found no proscribed interrogation.

In *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) the defendant was arrested in the course of investigation of a death and said that he wanted a lawyer. Then, in the course of being transported to the jail, he asked an officer, "what is going to happen to me now." The officer said that the defendant did not have to talk to him and the defendant said that he understood his rights. After a further reading of his rights the officer suggested that the defendant take a polygraph examination. When the polygraph officer suggested that he was not telling the truth, the defendant admitted that he had been driving the truck which was involved in the fatal accident, and that he had been drinking copiously. The Court held that, by asking about what would happen to him, the defendant initiated a conversation, and that, having done so, he could be questioned further, provided that he was adequately advised about his rights. Justice Rehnquist spoke for a four member plurality, and the concurring justice would have imposed a less rigorous test than the plurality indicated. The case demonstrates that a conversation initiated by the defendant after having asserted his right to counsel might justify further questioning, even though it did not relate to the charges involved in the pending investigation.

In *State v. Bittick,* 806 S.W.2d 652 (Mo. banc 1991) the defendant was arrested on suspicion of robbery. When advised of his rights he said, "how do I get one of those appointed attorneys?" The officer explained that the court would appoint an attorney, but that if he wanted one immediately he would have to make the contact. The suspect then said, "I guess I'll have to talk to you," and was assured that he did not and could remain silent. He then said, "I guess I'll talk with you," whereupon the officer again advised him of his rights. Our Supreme Court held that there was no violation of the teachings of *Miranda* or *Edwards,* so long as the court was satisfied that the defendant was aware of his rights and that his waiver was knowing and voluntary.

In *State v. Owens,* 827 S.W.2d 226 (Mo. App.1991) the defendant initially signed a waiver of counsel and advised the police that he knew *nothing about the murders* which were the occasion for his arrest. Counsel was appointed for him the next day. His mother then sent word to the police that he wanted to tell the truth and to clear a relative of suspicion. The police then approached the defendant, and he confirmed his *mother's report of his intentions.* The court held that he had appropriately initiated the conversation, and that there was no *Edwards* violation, or of the holding of *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) which holds that the *Edwards* rule applies to the Sixth Amendment right to counsel once counsel has been appointed.

The trial court, in line with the authorities just cited, could have found that Randall simply offered the defendant a chance to talk, that the defendant initiated a conversation on another subject not related to the present charges but rather having to do with the charges which occasioned his arrest, that he was properly advised of his rights including right to counsel, that he was offered the opportunity to get in touch with counsel by telephone, that he had willingly and knowingly waived his rights, and that there was no barrier to the admission of his voluntary statement. There is no evidence of police badgering, which was the prime concern of *Edwards* and *Roberson.* A bare statement such as, "would you like to talk to me" does not necessarily constitute words or actions "reasonably likely to evoke an incriminating response." *Rhode Island v. Innis,* 446 U.S. at 301, 100 S.Ct. at 1690. Further, it may be said that the defendant, by raising questions about his arrest on other charges, initiated this conversation. *See Bradshaw, supra.*

■ There was every indication that the police scrupulously respected the defendant's

rights. It would be naive to suggest that Randall did not hope that the defendant would make a statement, but the cases cited above demonstrate that, in the absence of a prohibited interrogation, that circumstance is not significant. The police undoubtedly hope that all suspects in their custody will waive their *Miranda* rights and permit interrogation. The earlier conversation about the facts of this case, after the defendant said that he knew his *Miranda* rights and the officer assured him that what he then said would not be used against him, is unusual, but the officer offered him the opportunity to call a lawyer and to reflect on the situation. The morning conversation imposes no bar to the admissibility of the afternoon conversation, following full explanation of the *Miranda* rights and a signed waiver.

### 3. *Other Issues*

The defendant claims prejudicial error in the court's overruling his objection to the prosecutor's statement in closing argument that "the defendant is a sexual thrill seeker." When objection was overruled the prosecutor went on to argue, "A big part of the thrill is the risk of being seen." The portion of the argument to which objection was made was not an unfair comment on the defendant's purpose, as expounded in his own statement. To the extent that the second portion added something to the first, it suffices to say that no objection was taken. Nor do we perceive any substantial prejudice in the statements, and find no error.

The defendant, finally, claims that counsel was ineffective in not requesting the court to give MAI–CR 3d 308.14.1, advising the jury that the defendant had a right not to testify and that his failure to do so was not to be held against him. Trial counsel testified that he had canvassed the jurors' attitudes about the defendant's testimony on voir dire, and that he felt that the giving of the instruction would simply highlight the defendant's election not to testify. Thus counsel made a reasoned tactical decision. The MAI–CR committee no doubt gave attention to varying attitudes of lawyers about this cautionary instruction, in providing that it is to be given only on request. We will not second-guess trial counsel on a point on which lawyers have differing viewpoints.

### CONCLUSION

The judgment of conviction and the order denying postconviction relief are affirmed.

CRANE, C.J., and AHRENS, J., concur.