Jimmy NEUSCHAFER, Petitioner,

v.

Harol WHITLEY, Warden of the Nevada State Prison, and Brian McKay, Attorney General of the State of Nevada, Respondents.

No. CV–R–85–590–ECR.

United States District Court,
D. Nevada.

March 12, 1986.

N. Patrick Flanagan, Asst. Federal Public Defender, Reno, Nev., for petitioner.

Brian McKay, Atty. Gen. by Brian R. Hutchins and David F. Sarnowski, Deputies, Carson City, Nev., for respondents.

## ORDER

EDWARD C. REED, Jr., District Judge.

Jimmy Neuschafer was convicted of the first degree murder of Johnnie Johnson,[1] a fellow inmate at the Nevada State Prison. The jury sentenced him to death. After exhausting his state remedies, he filed this petition for writ of habeas corpus on November 4, 1985. At a hearing on November 4, 1985, this Court ordered the execution stayed, which had been scheduled for 2:00 a.m. on November 5, 1985, and appointed the Federal Public Defender to represent Neuschafer. We also allowed an amended petition for habeas corpus to be filed. After a careful review of the entire record and a consideration of the claims which Neuschafer has presented to this Court, we deny the petition.

## I.

Neuschafer and the victim, Johnnie Johnson, were housed in the "S" wing of Unit 5 in the Nevada State Prison (maximum security) in Carson City in August 1981.[2] Inmates housed in "S" wing could not leave the wing and inmates from other sections of the prison could not enter it. Prison regulations in effect in August 1981

---

**1.** The victim's given name was Willard Taylor but we will refer to him as he was better known—Johnnie Johnson.

**2.** The facts in the text are taken and adopted from the opinion of the Nevada Supreme Court, *Neuschafer v. Nevada*, 101 Nev.Adv.Op. 78, 705 P.2d 609 (1985).

permitted only two men to be out of their cells and in the wing common areas at one time. Cells in the "S" wing were locked and unlocked by remote control by guards stationed in a glass walled control room. The guards could see parts of the wing directly and other parts by video cameras. Guards communicated with inmates in the wing by intercom.

Johnnie Johnson was the wing porter for the "S" wing. The wing porter kept the wing clean, served meals, and passed out supplies to the other inmates. The wing porter was permitted to be out of his cell all day. Other inmates, one at a time, were released from their cells for an hour or two a day. Thus, only one inmate besides Johnnie Johnson was allowed out of his cell at any given time.

On August 18, 1981, at 7:30 a.m., Johnnie Johnson was released from his cell. Ten minutes later Neuschafer was released from his cell. Neuschafer, as he had on previous occasions, helped Johnson serve breakfast to the other inmates that morning. Inmate Frederick Heimrich, who was housed next to Johnson's cell, testified that sometime later that morning he heard Neuschafer and Johnson arguing over "somas." Somas were prescription pain pills Neuschafer was given for his headaches. The gist of the argument was that Johnson had paid Neuschafer for some of the somas but Neuschafer then had refused to give the pills to Johnson. Some time later, Heimrich and inmate Gregory Barren heard Johnson enter his own cell and Neuschafer follow him. Barren then heard a thud against the wall of Johnson's cell and the squeak of bed springs. According to Barren, when Neuschafer returned to his own cell, he told Barren that he had killed Johnson.

Heimrich testified that when Neuschafer came out of Johnson's cell he hung a blanket over the doorway. At 9:30 a.m. Neuschafer had himself locked into his cell and told the guard to release Heimrich. After Heimrich was released, he took a note to Johnson. Johnson was lying on the floor of his cell. Inmates often sleep on the floor when they don't like their beds and Heimrich testified that he thought Johnson was asleep. Around 11:00 a.m. Neuschafer told Heimrich to report Johnson as a "man down." A man down meant that an inmate was either sick or injured in his cell. Heimrich informed the prison guards over the intercom that there was a man down.

Responding to the report, the guards entered the wing and removed the blanket from over the doorway of Johnson's cell. They found Johnson lying on the floor, tightly wrapped in a sheet from his neck to his ankles. A noose made of braided strips of bed sheets was around his neck. The noose or ligature was so tight that the skin bulged on either side of it and the guard had to use a pocket knife to cut it off. A criminologist testified that the strips of sheet making up the portion of the ligature around Johnson's neck were made of cotton and were consistent with the torn cotton sheets found in Neuschafer's cell. The sheets in Johnson's cell were polyester and cotton.

The guards attempted to resuscitate Johnson. He was taken by ambulance to a hospital in Carson City. Johnson died the next day due to a shortage of oxygen to his brain caused by the ligature around his neck. A pathologist testified that there was blood in Johnson's spinal cord indicating that his neck had been snapped back with some force.

At 5:45 p.m. on August 18, 1981, inmate Douglas Robinson gave a note to correctional officer Sonya Turek. Robinson testified that Neuschafer had given him the note with instructions to give it to the authorities. The note read: "To Whom It May Concern, I did something bad to Johnnie Johnson this morning so come and get me. Sincerely, Jimmy Neuschafer." At 8:51 p.m. that same day, inmate Barren handed another note to Turek. Barren testified that he had written a note to Neuschafer asking what had happened to Johnson. Neuschafer wrote back after ripping off the top of the paper with Barren's question on it. Barren delivered to Turek what Neuschafer had written: "It started

by him taking things first. My [illegible].... And this morning he tried to f— me. I just couldn't let that happen. So I tried to hang him. Please forgive me. I really feel bad, what I did." A documents expert testified that both notes were written by Neuschafer. The contents of these notes were read into evidence without objection.

At 6:45 p.m. on August 18, 1981, Neuschafer was interviewed by Rick Ricards and Ed Forrest, members of the prison staff investigating Johnson's death. Neuschafer was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He requested an attorney. No attorney was provided. The interview, however, continued and Neuschafer made an incriminating statement. The defense successfully moved to have this statement excluded at trial.

Following this interview, Neuschafer was placed in solitary confinement. Between August 18 and August 21, 1981, Neuschafer sent a note to the prison authorities. When questioned under oath, Neuschafer could not recall whether or not this note had contained a request to talk to investigators about the murder. Ricards set up an interview between Neuschafer and Detective Michael Efford of the Carson City Sheriff's Department. Ricards was told that Neuschafer wanted to talk to the police. Efford was told that Neuschafer had asked to talk to him. Neuschafer, however, stated that he did not request the interview. Efford was not told that Neuschafer had been previously interviewed and had requested an attorney. At the interview on August 21, 1981, Efford read Neuschafer his Miranda rights. Ricards and Forrest were also present. Neuschafer indicated that he understood them and did not request an attorney. He proceeded to give another incriminating statement. This statement was read into the record at trial over objections by defense counsel.

The jury found Neuschafer guilty of first degree murder. At the penalty hearing, the State presented evidence that Neuschafer had been convicted in May 1976 of raping and murdering two teen-age girls. Neuschafer was serving the first of two consecutive life sentences without parole when Johnson was killed. After the penalty hearing, the jury returned a verdict finding three aggravating circumstances: (1) that the murder was committed by a person under a sentence of imprisonment; (2) that the murder was committed by a person who was previously convicted of another murder; and (3) that the murder involved torture, depravity of mind or mutilation of the victim. The jury found no mitigating circumstances and sentenced Neuschafer to death. Neuschafer objects to the judgment of conviction, the death sentence, and the proportionality review conducted by the Nevada Supreme Court.

## II.

Neuschafer presents three claims in his petition for writ of habeas corpus. One challenges his conviction only, two challenge his death sentence only. The claim challenging his conviction is that the admission into evidence of the second statement violated the fifth and fourteenth amendments and the rule of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because it was taken after Neuschafer requested a lawyer. The two claims challenging Neuschafer's death sentence are: (1) that the jury erred by finding that the murder involved torture, depravity of mind or the mutilation of the victim; and (2) that the Nevada Supreme Court's review of the proportionality of the death sentence in this case was inadequate and thereby violated Neuschafer's right to due process.

This Court carefully considered those factors which would require an evidentiary hearing. *See Townsend v. Sain*, 372 U.S. 293, 312–13, 83 S.Ct. 745, 756–57, 9 L.Ed.2d 770 (1963). The record before this Court adequately provides the necessary information and, thus, no evidentiary hearing is required.

## III.

Neuschafer first contends that his conviction was unconstitutional because the

trial court erred by admitting his August 21, 1981, statement into evidence. Neuschafer argues that although he did not request an attorney at his second interview on August 21, his August 18th request for an attorney carried over and applied to the second interview. He concludes that under *Edwards v. Arizona*, the second incriminating statement should have been suppressed.

In *Edwards*, Edwards was arrested, taken to the police station, and interrogated. When he requested counsel, the interrogation stopped, and he was confined to the county jail. The next day, before counsel was appointed, two detectives came to the jail and asked to see Edwards. The jailer told Edwards that he had to talk to the detectives. The detectives advised Edwards of his *Miranda* rights, and he told them he was willing to make a statement without the presence of counsel, which he did. The Supreme Court held that Edwards' conduct did not amount to a waiver of his right to the presence of counsel. Specifically, the Court held:

"[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

*Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85 (footnote omitted).

A Supreme Court plurality recently noted that the *Edwards'* inquiry is not mechanical, but rather " ' ... *whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances.*' " *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct.

2830, 2834–35, 77 L.Ed.2d 405 (1983) (quoting *Edwards v. Arizona*, 451 U.S. at 486, n. 9, 101 S.Ct. at 1885–86, n. 9) (emphasis in *Bradshaw*). Further, according to the plurality, a two-step analysis is required to determine whether a suspect who invoked his right to counsel later waived his rights *Id.* 462 U.S. at 1045–46, 103 S.Ct. at 2835. The court must determine whether the defendant "initiated" further communications with police and, if so, whether under the "totality of the circumstances" the waiver is shown to be knowing and intelligent. *Id.* Accordingly, the Court will first examine whether the evidence demonstrates that Neuschafer initiated further communication with the authorities.

In *Bradshaw*, the Supreme Court ruled that an accused person had initiated a conversation with police, thereby effectively waiving his previously-invoked Fifth Amendment right to counsel during custodial interrogation. In that case, the accused's inquiry of police officers: "Well, what is going to happen to me now?" was held to be sufficient to evince a willingness on his part to open up a "generalized discussion" relating directly or indirectly to the investigation. *Id.*

Although Neuschafer testified on direct examination that he did not request a second interview, he admitted on cross-examination that he had sent a note to prison authorities, but that he couldn't recall whether or not he made any request to talk to the investigators of the murder. The investigators testified that the second interview was set-up on request of Neuschafer. The record fairly supports a conclusion that Neuschafer expressed a desire to speak to the authorities. A specific note to the prison authorities that Neuschafer wished to speak to the investigators would be sufficient to evince a willingness to discuss the case. *See Id.*

Next, the Court must examine whether, under the totality of the circumstances, Neuschafer knowingly and intelligently waived his right to counsel. Neuschafer testified at the hearing held outside the presence of the jury that he understood

that he did not have to talk to Efford. He also stated that he remembered some of the specific *Miranda* warnings. Neuschafer also clearly established that he did not request an attorney at this interview. Although Neuschafer did request an attorney during the first interview, he made no such request during the second and did not cut off interrogation. Neuschafer is no stranger to the criminal justice system. He knew that he could request an attorney but waived that right voluntarily and intelligently.

Therefore, the Court concludes that Neuschafer's custodial statements were not obtained in violation of his constitutional rights. The writ of habeas corpus is accordingly denied as to his first claim for relief.

### IV.

■ Neuschafer next argues that one of the aggravating circumstances found by the jury is not supported by the evidence. As we understand his argument, Neuschafer claims that because the jury found that the murder "involved torture, depravity of mind or the mutilation of the victim" and that all murders are arguably depraved, there was no showing in this case that there was more depravity than other murder cases where no death penalty was imposed. Thus, Neuschafer argues, the imposition of the death sentence was arbitrary and capricious and unconstitutional.[3] This argument is without merit.

The jury found three aggravating circumstances: (1) that the murder was committed by a person under sentence of imprisonment; (2) that the murder was committed by a person who was previously convicted of another murder; and (3) that the murder involved torture, depravity of mind or the mutilation of the victim. Additionally, the jury did not find that there were any mitigating circumstances. Nevada law provides that upon the affirmative finding of any one aggravating circumstance and the absence of any mitigating circumstance, the death penalty may be imposed. NRS § 200.030(4)(a).

According to *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) and *Wainwright v. Goode,* 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) (per curiam), as long as one valid statutory aggravating circumstance exists, a federal habeas court should not grant relief unless the evidence or factor in question was unconstitutionally inappropriate. Neuschafer does not argue that the jury's findings of the first two aggravating circumstances was in error or applied improperly or unconstitutionally. Nor does he argue that the jury erred by failing to find any mitigating circumstance. Thus, because two unchallenged aggravating circumstances existed, this Court need not reach the issue of whether the jury's finding that the murder involved torture, depravity of mind or mutilation of the victim was correct.[4] This claim fails to support habeas relief.

### V.

■ Finally, Neuschafer complains, without citing any specific facts, that the death sentence in this case was constitutionally disproportionate and excessive to the penalties imposed in similar cases.

---

**3.** Neuschafer asserts that because we do not know whether the jury found torture, depravity of mind or mutilation, this Court should overturn the sentence and remand the case back to the trier of fact to make a better record. Not only does it not matter which the jury found, but in light of our disposition of this issue, we need not determine it.

**4.** Even though we do not reach this issue, we note that the evidence supports such a finding. This was more than a simple strangulation. In this case, Neuschafer tore the bed sheets from his own bed and carried them into Johnson's cell, evidencing premeditation. The victim was hit on the side of the head with a chair leg. When the prison guards found Johnson, the ligature had been so tight that it had to be cut off with a knife and the skin bulged around it. Further, the pathologist stated that blood in the victim's spinal cord indicated that his neck had been snapped back with some force. The victim did not die immediately, but the next day. Johnson also struggled and choked on blood in his nose and mouth before being found. The evidence supports the jury's finding.

Jimmy Neuschafer's sentence to death for murder is, however, not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. As the Supreme Court recently noted, the state may single out for death penalty consideration certain aggravated murders, and that the imposition of the death penalty in such cases will not be constitutionally disproportionate to cases not presenting statutory aggravating circumstances. *See Zant v. Stephans,* 462 U.S. at 877, 103 S.Ct. at 2742.

Neuschafer argues that the proportionality review conducted by the Nevada Supreme Court[5] in his case was unconstitutionally inadequate because the sentence is disproportionate to penalties in similar cases. It is not this Court's function to conduct *de novo* review of the proportionality of Neuschafer's sentence. *See Moore v. Balkcom,* 716 F.2d 1511, 1518 (11th Cir. 1983). Rather we review whether the Nevada Supreme Court "properly perform[ed] the task assigned to it under the [Nevada] statutes." *Gregg v. Georgia,* 428 U.S. 153, 224, 96 S.Ct. 2909, 2948, 49 L.Ed.2d 859 (1976) (White, J., joined by Burger, C.J., and Rehnquist, J., concurring). This Court finds that the Nevada Supreme Court did properly evaluate the imposition of the death sentence on Neuschafer. Accordingly, his claim provides no basis to grant the writ.

## VI.

This Court has carefully considered every claim Neuschafer has presented in his petition for writ of habeas corpus. We are mindful that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (opinion of Burger, C.J.). This Court finds no constitu-

tional error warranting the issuance of the writ of habeas corpus.

IT IS, THEREFORE, HEREBY ORDERED that the petition for writ of habeas corpus is DENIED.

IT IS FURTHER ORDERED that the Order Staying Execution, entered by this Court on November 4, 1985, shall be vacated 30 days from the date of this Order denying the writ of habeas corpus. The Stay of execution shall remain in effect for said period of time in order to permit Neuschafer to request the issuance of a certificate of probable cause for appeal, file a notice of appeal, and seek a further stay of execution from the Ninth Circuit if he desires to do so.

IT IS FURTHER ORDERED that the official Court Reporter shall prepare a transcript of the hearing held before the Court on November 4, 1985. The transcript shall be prepared and filed within 20 days.

---

5. This Court notes that the Supreme Court recently held that the Constitution does not require a state supreme court to conduct a proportionality review as long as the state's procedures are not "so lacking in other checks on arbitrariness that it would [otherwise] not pass constitu-

tional muster...." *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 873, 79 L.Ed.2d 29 (1984). At the time Neuschafer committed the murder, however, the Nevada statutes required a proportionality review.