**UNITED STATES of America**

v.

**Shawn E. LYNCH.**

**Crim. No. 92–30–01–M.**

United States District Court,
D. New Hampshire.

Feb. 2, 1993.

Nancy Hart, Asst. U.S. Atty., Concord, NH, for plaintiff.

Walter H. Underhill, Boston, MA, for defendant.

## MEMORANDUM OPINION ON DEFENDANT'S MOTION TO SUPPRESS

McAULIFFE, District Judge.

Defendant seeks to exclude evidence of certain statements he made while being transported from a temporary detention facility to his arraignment. His motion to suppress asserts that these statements were obtained by the government in violation of his Fifth Amendment rights against self-incrimination. A review of the pertinent facts is in order.

*Relevant Facts*

During the evening of June 9, 1992, Special Agents Cronin and Coughlin, of the Bureau of Alcohol, Tobacco and Firearms, began searching East Boston for Defendant Lynch in order to execute a warrant for his arrest. Boston police officers assisted in the search. Defendant had been indicted by a federal grand jury as a felon in unlawful possession of a firearm. The charge arose from an alleged theft of an AR–15 semiautomatic rifle from Riley's

Sport Shop in Hooksett, New Hampshire, on December 22, 1991.[1]

After unsuccessfully checking a few places, the Agents returned to an East Boston police station, and then to their own offices. A short time later Boston police called to tell them that the defendant, responding to messages left with his family, had just reported to the station. Special Agents Cronin and Coughlin returned.

When they arrived, they observed the local police properly warning defendant of his *Miranda*[2] rights to counsel, to remain silent, and to refrain from incriminating himself. While the federal Agents did not actually participate in that process, Special Agent Cronin did interject a reiteration of the warnings, and told defendant that he was actually being arrested by them, as federal agents, in connection with their responsibility to enforce federal firearms laws. Special Agent Cronin also told defendant what he might expect in the immediate future. That is, that he would be transported that evening from Boston to a detention facility in Brookline, Massachusetts, where he would be held overnight, and then transported on the morning of June 10, 1992, to the federal courthouse in Boston for arraignment. Neither Agent Cronin nor Agent Coughlin had any intention of interrogating defendant at that time, and did not ask any questions.

Defendant was taken to the Brookline detention facility, where he was held overnight. At approximately 9:00 a.m. the next morning, Agents Coughlin and Cronin arrived at the facility. After obtaining permission to use local equipment, they took defendant's fingerprints, photographed him, and filled out various administrative forms. At that point, Agent Coughlin again advised defendant of his *Miranda* rights, employing ATF Rights Warning Form # 3200.4 as a guide.[3] Agent Cough-

1. The weapon was apparently returned to Riley's the next day, December 23, 1991.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The ATF Form 3200.4 is comprised of two substantive sections. The first, entitled "Statement of Rights," provides:

You must understand your rights before we ask you any questions.
You have the right to remain silent.
Anything you say can be used against you in court, or other proceedings.
You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.

lin read each enumerated right from the form verbatim and, after reading each statement, asked defendant if he understood that specific right, and, if so, to explain to Agent Coughlin, in his own words, what he thought it meant. Defendant understood his rights and demonstrated an ability to articulate what they meant in his own words.

After completing the warning, Special Agent Coughlin asked defendant to sign the form at a place indicating that he had read his rights, that they had been read to him, and that he understood them. Defendant signed the form.

Special Agent Coughlin then explained the rights waiver portion of the form, telling defendant that if he signed that portion, it would mean that he was willing to waive his rights and talk about the offense charged. According to Agents Coughlin and Cronin, defendant "stumbled over his words," and appeared somewhat apologetic, communicating in effect, that while he did not wish the Agents to think him uncooperative or a "wise guy," he did not wish to waive his rights and did not wish to make any statements. Special Agent Cronin told defendant that if he were undecided there was no need for him to talk, there would be plenty of time later, and that his

unwillingness to talk at that time would not be construed as lack of cooperation. Defendant declined to execute the waiver portion of the form.

Agent Cronin testified that defendant's stumbling over his words and other actions were treated as his being "not willing to talk to me." No interrogation occurred; no questions, other than routine ones incidental to the custodial relationship, were asked.

Upon completion of the *Miranda* warning procedure, Agents Cronin and Coughlin escorted defendant out of the detention facility to Agent Coughlin's car. Defendant was placed in the rear seat. Agent Coughlin drove. Agent Cronin took his own vehicle and, being familiar with the Boston area, led Agent Coughlin from Brookline to the federal courthouse.

Approximately two minutes after Agent Coughlin departed from the Brookline detention facility, defendant initiated an unprompted [4] conversation. He asked the following question: "Does this have anything to do with the thing up in Alton, New Hampshire?"[5] Special Agent Coughlin remained silent. A moment passed, whereupon defendant asked another unprompted question: "How do the feds know that I stole a gun?"

---

If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court. If you decide to answer questions now without a lawyer present, you still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer.

I have read this statement of my rights and it has been read to me, and I understand what my rights are.

A signature line and spaces into which the time and date are filled appear immediately below this section.

The second section, entitle "Waiver," provides: I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind have been used against me. I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions.

Again, a signature line and spaces into which the time and date are inserted appear below this section. In the instant proceeding, defendant signed below section 1 but refused to execute the waiver portion of the form.

4. On the walk to the car, and while in the car, defendant initiated some casual conversation with Agent Coughlin concerning matters "relating to routine incidents of the custodial relationship," such as whether Defendant's wife might be at the arraignment, whether she would know where to go, and whether Agent Coughlin thought that defendant would be detained overnight. Agent Coughlin did not initiate any questioning of defendant and merely answered each of defendant's questions to the best of his knowledge. Based upon the evidence presently before it, the Court concludes that none of Agent Coughlin's responses (whether oral or verbal) to defendant's questions was reasonably likely to elicit an incriminating response from defendant.

5. Thomas Moore, one of the individuals alleged to have been with defendant immediately after the weapon was taken from Riley's, lives in Alton, New Hampshire. There was some suggestion that the weapon was kept at the house in Alton until it was returned to Riley's, in Hooksett.

Special Agent Coughlin testified that at this point he did respond, by attempting to create the impression that a store surveillance camera had filmed defendant stealing the weapon at issue. Agent Coughlin testified that he said, "Well, security's really tight at Riley's Sport Shop." Agent Coughlin continued, telling defendant, "frequently there are more employees in the shop than customers and that no one could steal a gun without being detected." He concluded by saying, "You know, even bank robbers wear a mask." The implication was not true; no surveillance cameras captured defendant on film. Apparently, defendant's cousins had suggested to the authorities that he played a role in obtaining the weapon.

Agent Coughlin testified, and the Court finds, that he made up this ruse on the spur of the moment in order to "alleviate pressure on scared prosecution witnesses." He wanted the defendant to think that his arrest was based on store surveillance cameras filming him in the act of removing the weapon, rather than on his cousins' cooperation with authorities.

Defendant responded to the "ruse" by saying: "So, what you're telling me is they've got me on camera, right?" Agent Coughlin stopped defendant from making any further statements, telling him, "I am not going to discuss the investigation with you." Defendant remained silent for the rest of the trip, giving no further indication that he wished to discuss the subject matter under investigation or wished to waive the rights to silence and counsel which he had invoked not ten minutes or so earlier.

*Applicable Law*

The government seeks to introduce all three statements at trial, thereby establishing their "incriminating" character for purposes of deciding this suppression motion, *Rhode Island v. Innis,* 446 U.S. 291, 301 n. 5, 100 S.Ct. 1682, 1690 n. 5, 64 L.Ed.2d 297 (1980).

In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court considered the circumstances under which police may conduct (or resume) custodial interrogation after a per-

son has "expressed [a] desire to deal with the police only through counsel...." *Id.* at 484, 101 S.Ct. at 1884. The Court held that once someone has expressed such a desire, they may not be subjected "to further interrogation by the authorities until counsel has been made available ..., unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. at 1884–85. Subsequently, in *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Court elaborated on its holding in *Edwards,* writing:

> [E]ven if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, *where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.*

*Id.* at 1044, 103 S.Ct. at 2834 (emphasis added).

Incriminating statements made by someone in police custody, may be admitted in evidence against him, over his objection, only if certain constitutionally—mandated tests are met. Here, the Court must determine:

(1) whether defendant's statements were the product of custodial interrogation. *Miranda v. Arizona,* 384 U.S. at 467–68, 86 S.Ct. at 1624; *See also Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), (broadly defining the term "interrogation");

(2) if so, whether defendant was properly apprised of his constitutional rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966);

(3) if so, whether defendant invoked his right to submit to further custodial interrogation by the police only with counsel present. *Edwards v. Arizona,* 451 U.S. at 485, 101 S.Ct. at 1885;

(4) if so, whether the defendant subsequently initiated the conversation with the police in which he made the incriminating statements; and

(5) if so, whether the defendant knowingly, intelligently, and voluntarily waived his Fifth Amendment right to have counsel present during the interrogation. *Edwards v. Arizona,* supra; *Oregon v. Bradshaw,* supra; *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986); *United States v. Montgomery,* 714 F.2d 201, 203 (1st Cir.1983).

The procedural safeguards fashioned in *Miranda* apply when a person is taken into police custody and he or she is subjected to "custodial interrogation":

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected either to express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis,* 446 U.S. at 300–01, 100 S.Ct. at 1689.

*The First Two Statements*

Here it is unarguable, and the Court finds, that neither of defendant's first two statements was the product of custodial interrogation. Special Agent Coughlin's testimony relating the circumstances surrounding defendant's statements was direct, clear, candid and credible. His investigation was complete, an indictment had been returned, the arrest had been made, and he had no intent to question defendant in the absence of an explicit *Miranda* waiver.

While defendant initially engaged Agent Coughlin in general casual conversation about the day's proceedings, it is clear that it was due to defendant's own voluntary initiation that the casual conversation took a decidedly substantive turn when he asked: "Does this have anything to do with the thing in Alton, New Hampshire?" Tellingly, Agent Coughlin did not respond. He remained mute. He undoubtedly recognized the fact that a line had been crossed. After a moment or so of silence, Defendant continued: "How do the Feds know that I stole a gun?"

Those two incriminating statements[6] were entirely voluntary in character. They were not the product of a custodial interrogation or its functional equivalent. They were spontaneous statements unrelated to the idle chat preceding them, and they were not elicited by any words or actions of Agent Coughlin. *See, e.g., Rhode Island v. Innis,* 446 U.S. at 300–301, 100 S.Ct. at 1689.

Volunteered statements, which are not the product of custodial questioning, are admissible in evidence.

Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda v. Arizona,* 384 U.S. at 478, 86 S.Ct. at 1630. Although defendant was undeniably in the custody of federal agents at the time he made the first two incriminating statements, because they were not

---

**6.** The inflection and emphasis used by defendant is not clear, but the statements are incriminating to some degree as a matter of law by virtue of the prosecution's intent to admit them into evidence at trial. *Rhode Island v. Innis,* 446 U.S. at 301 n. 5, 100 S.Ct. at 1689 n. 5.

elicited through interrogation or its functional equivalent, the statements are entirely voluntary and are admissible in evidence against him.

*The Third Statement*

■ With respect to the third of defendant's incriminatory statements, however, further analysis is unavoidable. After defendant asked Agent Coughlin, "Does this have anything to do with the thing in Alton, New Hampshire?" and "How do the Feds know I stole a gun?," Agent Coughlin responded by telling defendant, "Well, security's really tight at Riley's Sport Shop." Agent Coughlin then told defendant that, "frequently there are more employees in the shop than customers and that no one could steal a gun without being detected.... You know, even bank robbers wear a mask." Defendant responded by asking, "So what you are telling me is that they got me on camera, right?" It is the admissibility of this statement to which the Court now turns.

The first, admittedly subtle, determination that must be made in considering the admissibility of the third incriminating statement is whether Agent Coughlin's ruse, communicating to defendant that, in effect, he had been caught on camera,

amounted to "custodial interrogation" as defined by the Supreme Court.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court defined "interrogation" quite broadly to include "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689. The Court defined "incriminating response" in an explanatory footnote as including "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.* at 301 n. 5, 100 S.Ct. at 1689 n. 5 (emphasis in original). The focus of the definition is on the perception of the suspect, rather than the intent of the police, although the majority conceded that the intent of the police may be relevant in deciding whether "the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Id.* at 301 n. 7, 100 S.Ct. at 1689 n. 7.

■ Defendant in this case was properly advised of his *Miranda* rights on two occasions and evidenced a full understanding of those rights. However, because he declined to waive his rights [7] and because the

7. The Supreme Court has yet to consider whether a refusal to waive one's rights amounts to an invocation of those rights. *See, e.g., Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). And, this Court recognizes that there is at least an implicit divergence of opinion on this subject. However, this Court considers a clearly articulated refusal to waive the right to counsel and actions consistent with a desire not to answer questions without counsel present, to be sufficiently unambiguous to trigger the right to counsel and to foreclose further inquiry by the police beyond questioning designed to clarify the subject's desire regarding the presence of counsel. *See e.g., United States v. Eaton*, 890 F.2d 511, 513 (1st Cir.1989) *cert. denied*, 495 U.S. 906, 110 S.Ct. 1927, 109 L.Ed.2d 291 (1990) (even an ambiguous or equivocal response to a question regarding defendant's desire to waive his right to counsel mandates that police terminate evidentiary interrogation); *United States v. Porter*, 776 F.2d 370 (1st Cir. 1985) (if it is unclear from defendant's words and conduct whether he wishes a lawyer, questioning officers must determine his desire before resuming investigative questioning.). *See, also, People v. Covington*, 532 N.Y.S.2d 36, 140

Misc.2d 871 (N.Y.Sup.Ct.1988) (a negative response to the question "now that I have advised you of your rights, do you want to speak with me?" necessarily means that the suspect does not wish to answer questions without an attorney present); *State v. Bowyer*, 181 W.Va. 26, 380 S.E.2d 193 (W.Va.1989) (a negative response to the question, "Are you willing at this time *without an attorney present to answer my questions?*" was an unequivocal invocation of right to counsel); *People v. Antonio*, 86 A.D.2d 614, 446 N.Y.S.2d 96 (N.Y.App.Div.1982) (when suspect said, "Nah, I don't want to talk to you. I don't want to say anything," in response to request to waive his right to counsel, court found that this amounted to an invocation of that right.); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (if suspect "indicates in *any manner* and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.") (emphasis added).

Accordingly, in light of defendant's unambiguous and steadfast refusal to waive his right to counsel, subsequent conduct consistent with that refusal, and Agent Coughlin's acknowledgement that, "I knew that I could not question him

prosecution seeks to introduce his third statement at trial, it is necessary to consider whether Agent Coughlin's ruse was reasonably likely to elicit an incriminating response, and, if it was likely to do so, whether Agent Coughlin knew or *should have known* that. *Id.* 446 U.S. at 302, 100 S.Ct. at 1690.

Agent Coughlin did not intend to elicit an incriminating statement from defendant by deceiving him about the source or strength of the evidence against him. His purpose was one of diversion through deception, not elicitation through deception. But, considering Agent Coughlin's ruse from *defendant's perspective*, as applicable authority requires, it was a comment very likely to elicit an incriminatory response. Presented with the assertion that videotape or other photographic evidence existed tying him to the crime charged, defendant would likely be expected to respond either with a protestation of innocence ("I wasn't there; they couldn't have me on film."), an outright confession of guilt ("O.K., I did it."), or other statements of differing degrees of incrimination ("Now I'm in trouble," or, "I guess I can't deny it anymore," or, "I didn't see any cameras when I was there," or something similar). The likelihood was that defendant would respond and that the response would be incriminating. In fact that is what occurred.

The Court now turns to whether Agent Coughlin reasonably *should have known* that his ruse would likely elicit an incriminating response. If he should have known, then his comments were the functional equivalent of express questioning, or "interrogation." *Rhode Island v. Innis, supra.* Defendant did respond by incriminating himself, and a reasonable person considering the prompt would have anticipated an incriminating response as likely. Agent Coughlin is experienced and should have known that telling defendant, in effect, that clear and unmistakable photographic evidence existed which linked him to the theft of the gun from Riley's was reasonably likely to elicit an incriminatory response. Accordingly, despite the laudatory purpose behind Agent Coughlin's statement, it did constitute an "interrogation" after defendant had invoked his right to counsel.

Having concluded that defendant invoked his rights to remain silent and to submit to interrogation only with counsel present, and that Special Agent Coughlin's statement was the functional equivalent of express questioning, and so, amounted to custodial interrogation under *Miranda*, the Court must next determine whether defendant initiated the conversation with Special Agent Coughlin, leading to the third statement. Absent such a finding, Agent Coughlin's comment would necessarily be found to violate the rule articulated in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), prohibiting any further interrogation once a subject invokes his right to counsel.

■ Finally, the Court must determine whether the prosecution has met its heavy burden to show a knowing, intelligent, and voluntary waiver by defendant of his Fifth Amendment rights under the totality of the circumstances. These inquiries are distinct; a mere showing that defendant initiated conversation with Agent Coughlin does not, *ex proprio vigore*, demonstrate that he waived his previously asserted right to counsel. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983).

Based upon the credible testimony of Special Agent Coughlin, the Court finds that defendant initiated the substantive conversation leading to the third statement. The Court also finds that defendant's statements evidenced a clear desire to discuss the details of the evidence against him and to engage in "a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. at 1045, 103 S.Ct. at 2834.

Thus, step one of the two remaining predicates to admissibility is satisfied. Step two of this analysis requires a separate inquiry into whether defendant *knowingly, voluntarily* and *intelligently*

about anything because he had not waived his rights," defendant shall be treated as having

invoked that right, triggering the protections established in *Edwards.*

waived his Fifth Amendment rights in making the incriminating statement. *Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612; *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1985).

Defendant twice refused to waive his rights to remain silent and to have counsel present, thereby invoking those rights. Accordingly, defendant's third statement cannot be used against him unless the prosecution shoulders the heavy burden of proving that subsequent to his invocation, defendant knowingly, intelligently and voluntarily waived his rights to remain silent and to the presence of an attorney during interrogation. *United States v. Montgomery,* 714 F.2d 201, 203 (1st Cir.1983). This burden is described as a heavy one because the Court must presume that defendant *did not* waive his rights. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). In establishing effective waiver, the prosecution must demonstrate several facts:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986).

The Court cannot find that the prosecution has met its heavy burden with respect to the third statement. The totality of the circumstances supports defendant's claim that he neither "knowingly," nor "intelligently," nor "voluntarily" waived the important rights he had already twice declined to waive. The prosecution's argument, that defendant's initiation of conversation coupled with his understanding of his rights when previously read to him equates to a knowing, intelligent and voluntary waiver, is not persuasive. *See Oregon v. Bradshaw,* 462 U.S. 1039, 1049, 103 S.Ct. 2830, 2836, 77 L.Ed.2d 405 (1983) (mere initiation of conversation by defendant does not conclusively demonstrate that he waived the previously asserted right to counsel.) Each time defendant was properly advised of his rights, he stood upon and did not waive them.

A review of the pertinent facts reveals the following:

Defendant twice expressly refused to waive his rights, the last refusal occurring fewer than ten minutes before the incriminating statement was made;

When defendant crossed the borderline between casual conversation routinely incident to the custodial relationship, and made voluntary incriminating statements, Agent Coughlin remained silent, apparently recognizing that defendant was providing evidence against himself;

Agent Coughlin, an experienced law enforcement officer and the agent in charge of this case, did not re-warn defendant before or after spinning his yarn about photographic evidence against defendant;

After telling his ruse (albeit for a proper purpose), which in fact had the effect of eliciting defendant's final incriminating response, Agent Coughlin tellingly stopped further conversation about the subject under investigation; and

Defendant did not protest, or indicate a willingness to waive his rights, or continue to ask questions or make statements about the offense. Rather, he acted in a manner entirely consistent with his earlier expressed desire not to waive, but to invoke, his *Miranda* rights. He sat silently.

In short, defendant did not act in a manner consistent with a knowing, intelligent, or voluntary waiver, and the totality of the circumstances does not lend itself to such a finding. Accordingly, the third statement was involuntary, unwarned, and obtained in violation of defendant's Fifth Amendment rights.

*Conclusion*

Defendant's Motion to Suppress Statements (document no. 40) is hereby granted in part and denied in part. The statements, "Does this have anything to do with the thing in Alton, New Hampshire?" and "How do the Feds know I stole a gun?" were entirely voluntary and not elicited in violation of defendant's constitutional rights. They will be admitted in evidence against defendant if presented. The statement, "So what you are telling me is that they got me on camera, right?" was elicited in violation of the defendant's constitutional rights and, therefore, will not be admitted in evidence against him.

SO ORDERED.