Death Opinion













IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,610






TIMOTHY WAYNE ADAMS, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM HARRIS COUNTY





 Cochran, J., delivered the opinion of the unanimous Court.


O P I N I O N




 Appellant pleaded guilty to and was convicted of capital murder for twice shooting
his eighteen-month-old son, Tim, in the chest during a stand-off with police officers. Tex.
Penal Code Ann. § 19.03(a). Pursuant to the jury's answers to the special issues set forth
in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge
sentenced appellant to death. Art. 37.071 § 2(g). (1) Direct appeal to this Court is automatic. 
Art. 37.071 § 2(h). Appellant raises six points of error, four of which deal with the
sufficiency of evidence to support the jury's findings on the punishment special issues, and
two of which deal with the admission of his tape-recorded custodial confession. We affirm.

A. Legal and Factual Sufficiency of the Evidence.

 In his first point of error, appellant claims the evidence is legally insufficient to
support the jury's affirmative answer to the future dangerousness special issue. Reviewing
the legal sufficiency of the evidence in the light most favorable to the verdict, we must
determine whether any rational trier of fact could have found, beyond a reasonable doubt,
that there is a probability that appellant would commit criminal acts of violence constituting
a continuing threat to society. Manns v. State, 122 S.W.3d 171, 193 (Tex. Crim. App. 2003). 
The circumstances of the offense alone, if sufficiently calculated, wanton and callous, or
morally depraved, may be sufficient to sustain the jury's affirmative answer to the future
dangerousness issue. Martinez v. State, 924 S.W.2d 693, 696-98 (Tex. Crim. App. 1996).

 The State's evidence at the guilt stage of the trial showed that appellant and Emma
Adams were married in March of 2000. In July, appellant and Emma had a son, Tim. On
Friday, February 15, 2002, when Emma discovered that appellant was keeping a gun in their
apartment, she decided to move out. That morning Emma took Tim and her fifteen-year-old
son from a previous relationship, Andrew, and moved in with her friend, Karen Farr. 
Accompanied by a police officer, Emma retrieved some of her things from the apartment on
Saturday while appellant was not there. Emma spoke with appellant on the phone on Sunday
and informed him that she was moving out. Appellant agreed that Emma could return to the
apartment on Tuesday to get more of her belongings, and he agreed that he would not be
there. After removing some of her property on Tuesday, Emma told appellant that she
needed to return another time for more belongings. Appellant agreed that she could return
the following day, and he told her that he would not be there.

 Emma made arrangements to meet Andrew at the apartment on Wednesday, February
20, after school. Andrew arrived at the apartment before Emma and Tim. Appellant, who
was already in the apartment, came up behind Andrew with a gun in his hand. Appellant
pointed the gun at Andrew and said, "I should shoot you now." Appellant ordered Andrew
to sit on the floor, and accused Andrew of stealing videotapes from him. Appellant then
angrily asked Andrew why Emma was "doing this" to him. Appellant told Andrew that
Emma was "going to pay." As they waited for Emma to arrive, appellant wrote her a note
and read it aloud to Andrew. The first page of the note states: (2)

 Look what you and 

 your selfish pride did. 

 

 You thought I was playing.

 Now you see I whaten [sic].


 Don't ever tell me what I 

 can't do with my own child. 


 You wish you had 

 let me spend time alone 

 with my child now. 


 You wish you had been calling 

 our son Tim Jr. now.


 You wish you had not called 

 me those names now. 


 You wished you had washed my clothes

 and fixed me something to eat now. 


Page two of the note states:


 You will never forget 

 this will you Bitch!


 You wish you had just 

 been a wife now don't you.


 You should of never tried 

 to take my son away from me. 


 I told you Bitch!


 I hate you to[o]! 


 You should 

 of loved 

 your husband 

 Bitch


 Appellant watched out the window for Emma. When he saw her coming he hid
behind the front door and opened it for her. When Emma came in, carrying the year-and-a-half-old Tim, she saw Andrew sitting on the floor and then saw appellant with a gun in his
hand. She put Tim down on the floor and asked appellant what was going on. Appellant
picked up Tim. He told Emma that Andrew had confessed to stealing from him, and he
yelled at Andrew to tell Emma the truth. Emma asked appellant why he was doing this, but
he continued yelling and pointing the gun. She picked up the phone and called 911. 
Appellant yelled at Emma to put the phone down, but she continued to talk with the 911
operator. Appellant pointed his gun at her. Andrew attempted to jump between Emma and
the gun. As appellant fired a shot, Emma dropped the phone, and she and Andrew ran for
the door. The bullet went through Emma's shirt and grazed her back. The gun jammed. 
Appellant attempted to un-jam it as Emma and Andrew ran from the apartment. Andrew
returned a couple of minutes later and pounded on the door. He begged appellant to hand
over Tim, but appellant did not answer the door.

 In the meantime, police officers, including a S.W.A.T (special weapons and tactics)
team, were dispatched to the apartment complex. Appellant could be seen looking out of the
apartment window, holding Tim on one arm and a gun in the other hand. One witness
standing outside of appellant's apartment saw appellant hit Tim on the head with the butt of
the gun. Appellant had numerous phone conversations with friends, relatives, co-workers,
and police officers while in the apartment. Appellant told one police officer with whom he
spoke that he wasn't giving himself up and that if anyone tried to enter the apartment, he
would kill himself. He told this officer that he had already shot himself in the stomach. 
Appellant told another officer on the phone that he hated his wife, that she mistreated him,
and that she threatened to take his son away. He told this officer that he was considering
suicide. Appellant told another officer during a phone conversation that he would shoot
anyone who came in the door.

 Emma's friend, Karen Farr, called appellant when she saw the coverage of the hostage
stand-off on television. Appellant told her "he was going to make Emma hurt the rest of her
days on the earth like she made him suffer." He also told Ms. Farr that he had shot Tim twice
in the chest and shot himself in the stomach.

 Houston Police Officer Gordon Michael Garrett, a volunteer member of the hostage
negotiation team, was at the apartment complex talking to appellant's employer, Diana
Garcia, when she received a call on her cell phone from appellant at around 7:25 p.m. Ms.
Garcia handed the phone to Officer Garrett. Appellant told the officer that he had killed Tim
an hour earlier. Officer Garrett talked appellant through a surrender plan, and twenty
minutes later appellant surrendered.

 Tim was found dead on the floor inside the apartment. He died from two bullet
wounds to his chest. The medical examiner testified that the muzzle of the gun had been
placed loosely against the surface of the skin, either close to or touching the victim's body,
when fired. Both bullets passed through the child's body and exited out his lower back. 

 At the punishment stage of trial, Sergeant James Lee Ramsey testified that appellant
gave him a tape-recorded statement after his surrender. The tape was admitted into evidence
and played for the jury. Sgt. Ramsey allowed appellant to give a narrative of his version of
what had happened. Appellant immediately began by complaining that Emma had "mentally
abused" him, citing examples of this perceived mental abuse and mistreatment. He claimed
that when he told Emma that Andrew was stealing from him, she called him a liar even
though she knew he was telling the truth. He stated that Emma would not allow him to do
"simple things" with Tim. Appellant described an incident in which he was given a chair for
Tim from a woman at work. Appellant said Emma put toys in the chair so that Tim could not
sit in it "just basically to be mean so he couldn't have the gift that I gave him." Appellant
stated that Emma was "mean and evil." He stated that "whatever I try to give my son, do for
him and be there for him, she would not let him have it." Appellant claimed that Emma
would untruthfully tell others that he would not give her money for things such as diapers and
food. He claimed "that was just her mean, evil way of being mean to me." Appellant stated
that he remained at work for hours after the time he was scheduled to get off because he did
not want to go home and face the terrible treatment from Emma. He claimed the worst thing
Emma did was to tell him that he could not be with Tim, that she "was gonna use the child
to hurt [him]."

 After allowing appellant to speak at length about the abuse he suffered from Emma,
Sgt. Ramsey asked appellant to tell him what had happened that afternoon. Appellant stated
that he went home from work early that day so he could "catch 'em at home." He stated that
he made Andrew confess to Emma that he had been stealing from appellant. He stated that
when Emma picked up the phone and called the police like "she done many times," he
"snapped" and shot at her. When Sgt. Ramsey asked him why he shot Tim, appellant
explained:

 My wife was hurtin[g] me, she was keeping him away from me. I was gonna
take him out and me too. Cause I didn't want him, gonna raise him to teach
him don't love your Daddy, he was this and he was that. She was gonna do
that. My parents couldn't even see my son, my Mother, my Daddy. She know
what she done, she gonna sit up there and change it all around. She knows
what she did.


 Appellant stated that he shot Tim twice in the chest as he was holding him. Sgt.
Ramsey then asked appellant if there was anything else he would like to say. Appellant
stated, "I could go on forever" and then continued to talk some more about Emma's "abusive
behavior." He stated that Emma would not open his card on Mother's Day, and made up an
excuse not to go out with him on Mother's Day. She also did not buy him a birthday present
and would not sing happy birthday to him. He complained that he rode the bus to work while
Emma drove her Trooper. He cited these as examples of Emma's "just mentally abusing me
in just all kind of ways." Sgt. Ramsey then stated to appellant, "Okay let me, let me get this
straight. You, you shot your son because [Emma] wouldn't let you have your son. So you
were just gonna take your son away from her, too, since you couldn't have him. Is that what
you're trying to tell us?" Appellant responded, "My wife got in my head. I was gonna take
me and my son out." 

 Emma testified at punishment that appellant was very suspicious and jealous and
accused her of seeing other men. He told her he had followed her to see if she was meeting
anyone. He once told her that he was hoping to catch her with another man so he could kill
them "right then and there." On the evening of Valentine's Day 2001, appellant listened in
on a phone conversation between Emma and a male co-worker. After the phone call,
appellant screamed at Emma and beat her on her head with his fists. Emma also stated that
at times appellant told her that if she ever left him, she would never see Tim again, and that
"no man would ever raise his child and she wouldn't raise him either." Emma said there was
no food in the house, and appellant would not give her money for food and would get angry
if she asked him for money.

 Karen Farr testified at punishment that in the months before the offense, she talked
often with both Emma and appellant, separately, about their marital problems. Appellant told
her about two movies he had watched in which the plot was that a man murdered his wife
and did not get caught. Ms. Farr stated that Emma and the children often came to her house
to eat because Emma said there was no food at her house.

 Appellant called numerous witnesses at punishment who testified that they knew
appellant from work, that he was an excellent employee, a proud father, and a nice and caring
person, that they were shocked to hear of the charges against him and they did not believe
appellant would be a future danger. The mother of appellant's fifteen-year-old son testified
that she had known appellant for nineteen years, that she had lived with appellant for about
a year after he returned from the service, that she was very surprised about the charges, and
that she had never had any disagreements with appellant over their son. Other punishment
witnesses who testified for appellant included jail personnel, fellow inmates, a criminal
justice professor, appellant's mother, and a forensic psychiatrist. Appellant also testified on
his own behalf.

 Appellant testified that he purchased a handgun about month before the offense. He
also put a rifle in "lay-away." He stated that he planned to use both weapons for hunting in
the fall. Describing the events surrounding the offense, appellant stated that when Emma
came home and he began yelling about what Andrew had stolen, Emma "did what she always
did, she picked up the telephone to call the police." He explained that "Emma would always
provoke me and try to get me into - you know, angry and into a rage then she would call the
cops, so when she did that, to me she was doing it again, and I closed my eyes. I didn't want
to shoot but I did want to shoot." Appellant stated that after he shot at Emma, he wanted to
fire again but the gun jammed. By the time he managed to get it un-jammed, Emma had run
from the apartment and down the stairs. After Emma and Andrew fled the apartment and the
police began to arrive outside, appellant decided to kill himself and Tim because otherwise
he would go to prison and "Emma would be successful in separating me from him and not
letting me love him and him love me." He further explained, "She was not going to get a
chance to hurt me or my son anymore, she wasn't going to keep us apart, she wasn't going
to teach him not to love me, and me, I couldn't love him."

 On cross-examination appellant admitted that his gun was fully loaded with eleven
bullets on the day of the offense. Appellant also admitted that he took the gun to work with
him on the day before and the day of the offense so that Emma would not remove it from the
apartment. Appellant agreed that his parents knew that his marriage was volatile and begged
him not to keep the gun at the apartment. Appellant denied purchasing the gun for the
purpose of shooting Emma. He insisted that he bought it to use for deer hunting, even
though he acknowledged that deer season was eight or nine months away at the time of the
purchase. Appellant admitted that he shot Tim a second time when he did not die after the
first shot. He also agreed that after shooting Tim, he wrote the second page of the note to
Emma.

 Viewing all of the evidence in the light most favorable to the verdict, the record
supports the jury's finding that appellant would be a future danger. The facts surrounding
appellant's deliberate, vengeful murder of his own baby, his total lack of remorse, and the
evidence of appellant's wanton and callous disregard for his own flesh and blood, leading
up to and following the offense, support the jury's affirmative answer to the future
dangerousness issue. Point of error one is overruled.

 In his second point of error, appellant claims the evidence is factually insufficient to
support the jury's affirmative finding on the future-dangerousness special issue. In McGinn
v. State, 961 S.W.2d 161 (Tex. Crim. App. 1998), the Court held that a factual- sufficiency
review of the evidence on future dangerousness is not required. Appellant asks that we
overrule McGinn and conduct such review in this case. He relies upon concurring opinions
stating that evidence of future dangerousness should be subject to a factual-sufficiency
review. Allen v. State, 108 S.W.3d 281, 287 (Tex. Crim. App. 2003)(Meyers, J., concurring);
Id. (Womack, J., concurring); McGinn, 961 S.W.2d at 174 (Baird, J., concurring). Appellant
does not present any new argument that was not considered by the majorities in McGinn or
Allen. We decline to overrule McGinn. Point of error two is overruled. 

 In his third and fourth points of error, appellant claims the evidence is legally and
factually insufficient to support the jury's negative answer on the mitigation issue. We do
not review sufficiency of the evidence to support the mitigation issue. Valle v. State, 109
S.W.3d 500, 503 (Tex. Crim. App. 2003); McGinn, 961 S.W.2d at 166. Points of error three
and four are overruled.

B. Admissibility of Appellant's Custodial Confession.

 In points of error five and six, appellant claims his confession was admitted in
violation of his right to remain silent and right to counsel under the Fifth, Sixth, and
Fourteenth Amendments to the United States Constitution.

 Appellant filed a pretrial motion seeking to suppress the tape-recorded statement he
made to Sgt. Ramsey. (3) The trial court held a hearing on the motion. Sgt. Ramsey testified
at the hearing that appellant was handcuffed and sitting in the back of a patrol car

when he arrived at the scene around 8 p.m. Sgt. Ramsey received information from police
officers at the scene that appellant had shot at his wife, that appellant had been barricaded
in his apartment with a hostage, and that an infant found in the apartment had been
transported from the scene and pronounced dead. When appellant agreed to talk to Sgt.
Ramsey, his handcuffs were removed and he was escorted to the sergeant's vehicle. 
Appellant sat in the front passenger seat and Sgt. Ramsey, who was unarmed, sat in the
driver's seat. Sgt. Ramsey testified that appellant angrily and spontaneously began to tell him
what had happened. Sgt. Ramsey told appellant that if he wanted to continue talking to him,
he would need to give appellant his rights and record his statement. Sgt. Ramsey testified
that he then turned on the tape recorder. The tape was admitted for purposes of the hearing
and played. A transcript of the tape recording appears in the record. The tape begins with
Sgt. Ramsey informing appellant of his rights. Appellant stated after each one that he
understood it. The following then transpired:

 Ramsey: Okay, you understand all those rights? You still want to go ahead
and make this statement? Tell me about what happened here tonight.


 Adams: Ah, I would like to say something off the record.


 Ramsey: Well the tape's running so let's, let's keep it all on the record okay.


 Adams: Well[.]


 Ramsey: Cause I want it to be your, your side of the story and I don't want
anything to be off the record. I want it to be in your voice.


 Adams: What I don't understand is why it's not in my favor to have an
attorney here. I know what you sayin[g] that me and you probably never ever
talk. How me not, me telling my attorney the same thing I'm telling you is not
gonna never end up in court.


 Ramsey: Okay you do have the right to an attorney and if you want an attorney
you can certainly have one. What I, what I told you is that I am here with you
right now and if you wanted to talk to me now is the time to do it. If not then
I'll just, I'll just send you downtown in a, in a uniform car. But you certainly
have that right to an attorney or you have the right to waive an attorney and go
ahead and tell me your side of the story as to what, what transpired here
tonight. Now you were already telling me before I stopped you about some of
the things that, that led up to what happened tonight. And I, I stopped you,
didn't I?


 Adams: Yes, sir.


 Ramsey: And I asked you to let me read you your Miranda warning. So we
can continue from that point or you can back up and ah and just start all over
and tell me what happened here tonight. Or we can turn this tape off right
now. It's up to you, it really is.


 Adams: Lordy, Lordy, Lordy, Lordy.


 Ramsey: You need a tissue?


 Adams: Nah.


 Ramsey: Okay.


 Adams: Don't feel comfortable (inaudible).


 Ramsey: That's, that's your right, that's your right.


 Adams: I don't have a chance anyway if I did wrong.


 Ramsey: Well I just want to give you an opp . . . opportunity to tell your side
of the story here and if you want to wait for an attorney that's certainly your
prerogative. But I stopped you because you were talking and I wanted to give
you your Miranda right[s]. So if you want to wait and talk to an attorney that's
fine. If you don't want to tell me your side of the story right now that's fine.


 Adams: Well let's get an attorney.


 Ramsey: Okay that's fine, we'll stop the tape now. The time is ah 2050 hours.


The tape was then turned off. When it was turned back on, the following exchange took 


place:


 Ramsey: . . . The time is now 2052 hours and ah . . . Tim when I had the tape
off ah what did you tell me in regards to your statement?


 Adams: I thought I should have an attorney.


 Ramsey: And then what did you say after I turned the tape off? Did you tell
me to turn it back on again?


 Adams: Yes I asked you to turn it back on again.


 Ramsey: Okay.


 Adams: Yes I did.


Sgt. Ramsey again informed appellant of his rights, and appellant again stated that he
understood each one. The following exchange then occurred:

 Ramsey: Now when I had the tape off you told me that you decided to tell
your side of the story. Now do you understand those rights? And at this time
wish to waive them and tell your side of the story?


 Adams: Yes I do.


 Ramsey: Okay it's all yours. Go ahead and tell me any, anything you want to
tell me regarding tonight.


The tape was played in its entirety during the hearing. Sgt. Ramsey testified that during the
couple of minutes that the tape was turned off, appellant re-initiated the discussion, wanting
to know why he could not tell his side of the story. The sergeant told appellant that it was
fine if he wanted to talk to an attorney, but that his chance to tell his story to him was right
then. During cross-examination, Sgt. Ramsey denied that he told appellant that he would be
better off without an attorney or that it was not in his favor to have an attorney present. He
stated that if appellant believed he had told him those things, then appellant had
misunderstood him. Sgt. Ramsey stated that during the time that the tape was turned off,
appellant continued to talk about himself and Emma.

 Appellant also testified at the hearing. He claimed that Sgt. Ramsey told him before
the tape recorder was turned on the first time, and again in the couple of minutes that the
recorder was turned off, that it was not in appellant's favor to have an attorney and that
appellant would not get his story told unless he told it to Sgt. Ramsey. Appellant could not
remember whether he or Sgt. Ramsey re-initiated the conversation after the recorder was
turned off. He testified that he asked the sergeant to turn the tape recorder back on because
Sgt. Ramsey was making it look like it was not in appellant's favor to have an attorney. He
claimed that Sgt. Ramsey also told him that Tim was still alive and on his way to a hospital. 
On cross-examination appellant stated that during the two minutes the recorder was turned
off, he continued to talk about himself and Emma, in the same manner and to the same extent
that he did while the tape was on.

 The trial court overruled appellant's motion to suppress and made express findings. 
The court found that appellant was fully informed of his rights, that he understood and
waived his rights, and that his taped statement was voluntarily and knowingly made, without
threats, promises, or coercion. The court also specifically found appellant asserted his right
to an attorney, after which there was a two-minute gap while the recorder was turned off. 
The court further found that appellant then re-initiated the conversation with Sgt. Ramsey. 
The court found Sgt. Ramsey's testimony credible, specifically on the question of what he
told appellant while the recorder was turned off.

 In point of error five, appellant argues that his Fifth Amendment right to counsel was
invoked when he told Sgt. Ramsey that he wanted an attorney. He further argues that the
officer, not he, re-initiated the conversation. 

 The Fifth Amendment right to counsel is invoked when a person indicates a clear and
unambiguous desire to speak to an attorney or have an attorney present during questioning. 
Cross v. State, ___ S.W.3d ___, ___ 2004 Tex. Crim. App. LEXIS 1473 * 7-8 (Tex. Crim.
App. 2004); Dinkins v. State, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995). Once a suspect
invokes his right to counsel, interrogation by the police must cease until counsel is provided
or until the suspect initiates further communication with the police. Cross, ___ S.W.3d at
__, 2004 Tex. Crim. App. LEXIS at * 7-8 (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)). 

 At a suppression hearing, the trial judge is the exclusive trier of fact and judge of the
credibility of the witnesses and the weight to be given their testimony. Herron v. State, 86
S.W.3d 621, 628 (Tex. Crim. App. 2002). The reviewing court gives almost total deference
to the trial court's determination of historical facts as long as they are supported by the
record. We also defer to the trial court's application of law to fact when the analysis turns
upon an evaluation of credibility and demeanor. Id.

 Appellant initially asserted his Fifth Amendment right to an attorney and Sgt. Ramsey
can be heard on the tape ending the interview and turning the recorder off. Sgt. Ramsey
testified at the hearing that appellant re-initiated the conversation after the recorder was
turned off. Appellant testified that he could not remember who re-initiated the conversation,
but that it was possible that he had. When the tape recorder was turned back on, appellant
is heard on the tape agreeing with Sgt. Ramsey that he-appellant-had asked that the tape be
turned back on because he wanted to tell his side of the story. This tape-recorded colloquy
suffices to support the trial court's finding that appellant re-initiated the interview. See
Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983) (plurality op.) (defendant's statement,
"What is going to happen to me now?" could be understood as a re-initiation of
communications with police). Appellant was informed of his Miranda rights a second time,
and he expressly waived them. Evidence in the record supports the trial court's ruling that
there was no violation of appellant's Fifth Amendment rights under Edwards or Bradshaw. 
Id.

 In his sixth point of error, appellant claims that his Sixth Amendment right to counsel
had attached because appellant was in custody and Sgt. Ramsey's focus had shifted from
investigatory to accusatory. A defendant's Sixth Amendment right to counsel attaches with
the commencement of adversarial judicial proceedings against him, and continues through
every subsequent "critical stage." Thompson v. State, 93 S.W.3d 16, 23 (Tex. Crim. App.
2003); McFarland v. State, 928 S.W.2d 482, 507 (Tex. Crim. App. 1996). Arrest, by itself,
does not constitute an adversary proceeding. Anderson v. State, 932 S.W.2d 502, 506 (Tex.
Crim. App. 1996); Green v. State, 872 S.W.2d 717, 720 (Tex. Crim. App. 1994). Examples
of adversary proceedings giving rise to a Sixth Amendment right to counsel include the filing
of an indictment, an information, or a complaint, or arraignment of the accused. McFarland,
928 S.W.2d at 507.

 At the time of Sgt. Ramsey's interrogation of appellant, no formal proceedings had
been initiated against him. Appellant suggests that when the investigation shifts from
investigatory to accusatory, the Sixth Amendment is implicated, citing Escobedo v. Illinois,
378 U.S. 478 (1964). While there is language in Escobedo distinguishing between
investigation and accusation, the Supreme Court's conclusion there that the Sixth
Amendment was triggered was based in part upon the facts that the suspect had repeatedly
requested and been denied an opportunity to consult with counsel, and had not been
effectively warned of his absolute right to remain silent. Escobedo, 378 U.S. at 490-91. 
Moreover, the Supreme Court has cautioned that "Escobedo is not to be broadly extended
beyond the facts in that particular case." Michigan v. Tucker, 417 U.S. 433, 438 (1974); see
also Kirby v. Illinois, 406 U.S. 682, 689 (1972); Johnson v. New Jersey, 384 U.S. 719, 733-34 (1966). The facts in this case are not like those presented in Escobedo. The record
supports the trial court's ruling that appellant's Sixth Amendment rights were not violated. 
 Points of error five and six are overruled.

 The judgment of the trial court is affirmed.


Delivered: November 17, 2004


Do Not Publish
1. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal
Procedure.
2. Appellant testified at punishment that he wrote the first page of the note while he and
Andrew were waiting for Emma, and he wrote the second page after he killed Tim. There are
blood smears on the second page of the note and the writing is less uniform than it appears on the
first page.
3. Appellant's motion sought to suppress other statements made by appellant and his point
of error refers generally to the improper admission of his confession and "other evidence." 
However, because appellant complains solely about the tape-recorded statement in his argument
on appeal, that is the only evidence we address.